James Paul BURNS, Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas Department of Corrections, and Robert Cousins, Warden, Ellis Unit, Texas Department of Corrections, Respondents-Appellees.

No. 78–3109.

United States Court of Appeals, Fifth Circuit.

April 11, 1979.

Richard J. Clarkson, Beaumont, Tex., for petitioner-appellant.

Joel Berger, Legal Defense Fund and Educational Fund, Inc., NAACP, New York City, for amicus curiae.

John L. Hill, Atty. Gen., Anita Ashton, Asst. Atty. Gen., Austin, Tex., for respondents-appellees.

Before GEE and VANCE, Circuit Judges, and HUNTER,* District Judge.

GEE, Circuit Judge:

*Witherspoon v. Illinois*[1] and its progeny form the legal terrain of this difficult and distressing case. Its factual merits are not involved, so that—mercifully—we are spared recounting the pitiful details of the

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

gross and brutal murder which the evidence amply shows this habeas petitioner committed. The only points before us concern the manner in which the jury that imposed his death penalty was constituted. Suffice it to say that if any crime merits such punishment, it is thoroughly deserved by Burns. Nevertheless, a faithful observance of Supreme Court authority forbids its imposition here, and it falls to us to say so.

*Witherspoon* provides that a venireman can be struck for cause only when he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." 391 U.S. 510, 522 n.21, 88 S.Ct. 1770, 1777 n.21, 20 L.Ed.2d 776. The Court further defined this footnote holding by acknowledging a state's power to exclude veniremen who

> made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

(Emphasis in original).

Footnote 21 also states that if the voir dire testimony indicates that veniremen were excluded on "any broader basis . . the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion." [2]

In its next significant opinion on the *Witherspoon* issue, *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), the Court, again through Mr. Justice Stewart, invalidated yet another death sentence. Several veniremen had been excused on such typical grounds as that they did not "believe in" or had "a fixed opinion against" capital punishment. Although the petitioner there had complained below only of a confession assertedly coerced, he raised the *Witherspoon* question in brief and oral argument before the Court. Elevating its mainly footnote expressions in *Witherspoon* to text, the Court struck down the death sentence imposed by a jury so constituted.

Next came *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), a per curiam decision reiterating the principles laid down in *Witherspoon* and *Boulden* and striking down the death sentence where veniremen had been excused for "conscientious scruples about imposing the death penalty" or for not believing in it. And in *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the Court added, in another per curiam, that excluding even *one* venireman on grounds at variance with the *Witherspoon* standard was fatal, and this although the state may have gone to trial with one peremptory challenge unexercised.

Finally and most recently, the Court handed down its opinion in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Here the Court at last rejected a *Witherspoon* challenge, though it vacated the imposed death sentence on other grounds. Four veniremen had responded, in reply to prosecution questioning, that they were sufficiently opposed to capital punishment that they could not take the law and hear the evidence " 'without con-

---

**2.** The Court's reasoning rests on the jury's character as a representative cross-section of the community. Citing current public opinion polls, it noted that less than half of our citizens then believed in the death penalty and that, between 1960 and 1966, the percentage had fallen from 51% to 42%. 391 U.S. 510, 520 n.16, 88 S.Ct. 1770, 20 L.Ed.2d 776. Thus, the Court reasoned, to exclude from the jury those merely "reluctant" to pronounce it would be to constitute an unrepresentative body, one which the Court later permitted itself to characterize (over the protest of Justices Black, Harlan and White) as a "hanging jury." 391 U.S. 510, 523, 88 S.Ct. 1770, 20 L.Ed.2d 776. And lest the point be lost on the reader, the Court cited and quoted with apparent approval Arthur Koestler's 1956 polemic against capital punishment. 391 U.S. 510, 520 n.17, 88 S.Ct. 1770, 20 L.Ed.2d 776.

sidering the fact that capital punishment' might be imposed." Under further questioning by the trial judge, each twice stated specifically that, because of the strength of his convictions, he could not swear to well and truly try the case and follow the law knowing that the court might impose a death sentence if guilt were found. Citing language from *Witherspoon* and *Boulden,* the Court held that jurors who could not be trusted to abide by the law as given them by the trial judge were properly excluded.

It is true that this "untrustworthiness" took the more honorable form of being unwilling to take the oath to follow instructions. Aside from this moral distinction, however, we would see no difference between one who refuses to be sworn in such a case because of his convictions and one who avows that he will take an oath to be indifferent to the penalty but will feel free, because of the strength of his convictions, to disregard it. Certainly, one who so avows holds strong views indeed and not mere general reservations or reluctance about capital punishment. His position may be slightly less extreme than one who is resolved to vote against the death penalty automatically and regardless of the evidence, but he clearly indicates that he will not serve unless he is legally and morally free to disregard his oath.

And so our survey of ruling Supreme Court law in the area is complete. It may be summarized:

 1. Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds. A mere disbelief in it, or even "conscientious or religious scruples against its infliction"[3] will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law.

 2. No jury from which even one person has been excused on broader *Wither-*

*spoon*-type grounds than these may impose a death penalty or sit in a case where it may be imposed, regardless of whether an available peremptory challenge might have reached him. Bearing these in mind, we turn to the jury in Burns' case.

Section 12.31(b) of the Texas Penal Code provides that no person is qualified to serve as a juror "unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact." Tex.Penal Code Ann. § 12.31 (1974). The questioning of four veniremen on the Burns panel—Doss, Mann, Tillman, and Mitchell—reflects this provision; and each said at least once that the mandatory death penalty would affect his or her deliberations on issues of fact. Mrs. Doss testified that she did not believe in the death penalty; Mrs. Mann testified that she had thought about the death penalty a lot and was against it, and in no circumstances could she give it. Mr. Tillman acknowledged additionally that he could not sit and decide this case due to the existence of the penalty, that it would be "real hard" to sit and listen objectively to the issues, and that he could not do it. Mrs. Mitchell commenced by saying that she did not think the mandatory sentence would affect her deliberations on the facts, but she later said it probably would affect her decision or deliberations and finally stated that she was sure her deliberations on issues of fact would be affected. The pertinent portions of the sworn voir dire of these veniremen are set out in the Appendix.

Defendant's counsel did not clearly object to the exclusion of each of these veniremen. Regarding Mrs. Doss and Mrs. Mitchell, he requested and was denied the right to question them further. For Mrs. Mitchell, he questioned the sense in which she had interpreted "affect," whether she meant that she would consider the gravity of the penalty or meant instead that she could not consider death at all. He then excepted to the court's sustaining the state's challenge

---

**3.** *Witherspoon v. Illinois,* 391 U.S., at 522, 88 S.Ct., at 1777.

for cause to Mrs. Mitchell. Regarding Mr. Tillman, he only noted an exception to the fact that the " *Witherspoon* question" was not asked. No comment was made regarding Mrs. Mann. The state used only 13 of its 15 peremptory challenges.

We need go no further than to the examination of Mrs. Doss to see that at least one prospective juror was excused for holding views about capital punishment not shown to be sufficiently unbending to meet *Witherspoon* standards. Three times in succession she affirmed that she "did not believe in" the death penalty. She then acknowledged that the mandatory penalty of death or life imprisonment would "affect" her "deliberations on any issue of fact in the case." This is all. Defense counsel immediately stated he thought she should be asked further questions, but the court excused her without more, observing, "I don't know what you could ask." Unfortunately perhaps, we do.

She could have been asked whether, despite her expressed convictions, she could put her disbelief aside and do her duty as a citizen. Her answer might have been that she could. Or she could have been asked *what* effect the presence of a possible death sentence would have on her deliberations. Her answer might have been that she would wish to be very sure of guilt, to be thoroughly convinced, before she could find facts in such a way that the death penalty might result. Either answer would doubtless have rehabilitated her for jury service. An answer that she would not take or could not comply with the required oath not to be "affected" in her deliberations would doubtless, upon a proper definition of "affected" as meaning "disablingly" or "insurmountably" affected, have clearly disqualified her. To be sure, these are mere speculations about what her answers to such questions might have been. The point is that nothing in her actual answers forecloses them. Her mere acknowledgment that the penalty would "affect" her deliberations does not do so: what candid and responsible citizen would not admit as much, could truthfully swear the proposition to be one of no concern whatever?

True, the last question was phrased in the very terms of the oath that would be required of her as a juror, so that an iron literality might hold her properly disqualified under the Texas statute. But if so, then the statute is impermissibly broader than *Witherspoon* and its follow-ons. These clearly demand at the least that the effect be a profound, perhaps an insurmountable, one before the venireman can be disqualified. Even *Lockett,* the most recent and arguably the least stringent of *Witherspoon's* progeny, demands an effect to the degree of foreswearing.

This being true, the mere reply by Mrs. Doss that the potential penalty would "affect" her is insufficient to permit her disqualification. Such an ambiguous answer spans the range of possible effects on her from a mere heightening of the seriousness with which she might approach her deliberations as a juror, through conscientious and moral dilemmas foreseen, to an utter refusal to deliberate rationally at all. More than this was required for her disqualification, and more was denied.

Taken as a whole, Mr. Tillman's replies are almost as dubious. He, too, acknowledged that he "thought" and "believed" that his deliberations would be affected, that to be objective in the face of a potential death penalty "would be real hard to do," and finally that he could not be. But a fair reading of his responses leaves the mind unsatisfied what his response to the hard questions would have been had they been asked. They were not; all he did was admit he would be "affected" to some unknown degree.

Finally, the state contends in passing that Burns' trial counsel failed to preserve any errors in excusing veniremen, thus waiving them under the rule of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). We are unable to

agree. The Texas Court of Criminal Appeals must, in passing on Burns' direct appeal, have considered error properly preserved under state practice as to the excusing of Mrs. Doss, since it considered the matter on its merits and held that the failure to permit further questioning of her at counsel's request was in fact erroneous.[4] Further, counsel objected to the excusing of Mr. Tillman for failure of the prosecutor to ask " 'the question required by the *Witherspoon* case'." [5] More, much of the voir dire concerned the *Witherspoon* problem; the trial judge's comments and questions, many of which are set out in *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977), clearly indicate that his attention was focussed upon it during the entire process of cutting the panel. This being so, we think defense counsel's request as to Mrs. Doss, at least, was sufficient to avoid a waiver under state procedural rules. And as we noted above, the Texas court apparently thought so too, since it addressed her recusal on substantive grounds. We therefore need not grapple with the question whether counsel's actions, though imperfect for purposes of state procedure, might yet suffice to prevent a waiver for our purposes in a matter of such gravity. That Pandora's Box we leave to another day.

We cannot close without voicing our dissatisfaction at the unfortunate result to which logic and our lights on *Witherspoon* have driven us. Indeed, it is with something like agony—though only a pale shadow of what must have been felt by the victim of Burns' ghastly crime—that we intervene to set aside in part the operation of state policy and procedures aimed at preventing further atrocities of this kind. Nor do we retreat an inch from our observation in *Spinkellink v. Wainwright* [6] that "the State also enjoys the right to an impartial jury . . . and impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution." After all, the prosecution speaks in some degree for Burns' helpless and pitiful victim and to that degree justly claims in his right.

But the requirements of *Witherspoon* are clear, and the Supreme Court has made equally clear in later decisions that it will not countenance their grudging or ungenerous application. We could not, even if we would, trench upon them here in any finally effective way. It well may be that, measured by some universal law or standard, the Texas statute is just and fair. But we must measure by *Witherspoon*, and by it Burns' death sentence cannot stand.

We therefore REVERSE the judgment of the district court and REMAND the cause with instructions that the writ issue to the extent only that execution of petitioner's existing death sentence is forbidden and for such other proceedings as the court shall think fit. It is so ORDERED.

REVERSED and REMANDED.

## APPENDIX

*Mrs. Billie L. Doss:*

Q (By the prosecutor, Mr. Green): All right. Let me ask you this question, a

---

**4.** It did so, although it reached a conclusion at variance with ours on the merits of the error, concluded that it was harmless for various reasons with which we have stated our disagreement above, and observed in passing that counsel's only comment was that he thought she should be questioned further. *Burns v. State*, 556 S.W.2d 270, 278 (Tex.Cr.App.1977). It is not lightly or with any satisfaction that we respectfully disagree with the conclusions of that able court on this point, as did Judges Roberts and Phillips in dissent. Central to that court's analysis of the propriety of excusing Mrs. Doss, however, is the notion that the Texas statute requiring a juror's excusing on a mere showing that in some unspecified degree the potential of a death sentence would "affect" his deliberations is a ground independent of *Witherspoon* standards. But *Witherspoon* footnote 21 seems to us unequivocal in denouncing such wider needles-eyes where the death penalty is concerned, and it is overriding law that we are oathbound to follow.

**5.** *Ibid.*

**6.** 578 F.2d 582, 596 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

sentence of life imprisonment or death is mandatory on conviction of a capital penalty case, you understand that?

A Yes, sir, I understand it.

Q All right. And this is a capital felony case.

A I don't believe in it.

Q Ma'am?

A I do not believe in it.

Q Let me go into it then. You told me just then that you did not believe in death?

A That's right.

Q All right. Then will the mandatory penalty of death or imprisonment for life affect your deliberation on any issue of fact, which what you just told me it will, in other words the mandatory penalty of death or imprisonment for life will affect the deliberations on any issue of fact in this case, is that correct?

A That's right.

MR. GREEN: All right. Judge, we ask this juror be excused.

MR. ABALOS: I think we should ask some further questions about this matter.

THE COURT: I don't know what you could ask. You challenge her for cause, is that correct?

MR. WILLIAMS: That is the magic term phrase and she answered it the way you are not supposed to.

THE COURT: Ma'am, I will excuse you. You are challenged for cause, you will not be on the jury. You are dismissed from jury service. Thank you very much for your attendance.

\* \* \* \* \* \*

*Mr. Edmond L. Tillman:*

Q (By the prosecutor): \* \* \* As the judge told you I believe yesterday that the type of case we are trying here is one which is called a capital felony case and the judge has told you that the indictment has been returned and alleging capital felony and in that indictment the grand jury alleges that on or about the 4th day of August, 1973, that the defendant in this case committed murder by murdering W. E. Pete Mc-Donald while in the course of committing a robbery. Of course the death penalty is now in effect in cases such as this, capital offense, capital felony case and I would like to start off briefly by saying that this is a capital felony case as I have already said, and ask you, will the mandatory penalty of death or imprisonment for life affect your deliberations on any issue of fact in this case? In other words the fact that the punishment is mandatory life or death, would that affect your deliberations on any issue of fact?

A. Yes, I think it would.

Q All right. In other words you are telling us that, I guess that you do not believe that you could sit and decide this case due to the fact that an issue of, in other words the fact that the death penalty is in existence in this particular case?

A. Yes.

Q And you do not believe in the death penalty or believe that you can sit up there, that is your belief and we respect that but you cannot sit up there objectively and listen to the issues realizing that the outcome would be death?

A It would be real hard to do.

Q You are telling us that you could not do that?

A Right.

Q And of course I respect that belief and understand it, we have had other people say that and if it would affect your deliberations, which you have told us it would, we ask the court at this time to make sure again the fact that the mandatory death, mandatory penalty of

death or imprisonment for life will affect your deliberations on any issue of fact, and it will?

A Yes.

THE COURT: Thank you, sir, for coming down. You are excused from jury service, you are dismissed for the term. Thank you very much for your time.

\* \* \* \* \* \*

MR. CLARKSON: \* \* \* Your honor, the defendant excepts to the court's ruling excusing Mr. Tillman for cause on the same grounds that we objected to the court's ruling excusing Gary Singleton, that the district attorney has not asked the question required by the Witherspoon case in that the witness failed to testify that under no circumstances could he answer the questions propounded to him by the court in this case.

\* \* \* \* \* \*

*Mrs. Gladys M. Mitchell:*

Q (By the prosecutor): \* \* \* I will start off by telling you a sentence of life imprisonment or death is mandatory on conviction of a capital felony and will the mandatory penalty of death or imprisonment for life affect your deliberations on any issue of fact in this case, in other words the fact that it is mandatory death or life, will that affect your, will that affect you?

A I don't think so, but may I comment?

Q Yes, ma'am.

A I really believe that if a person does something like this he or she should be punished severely but I don't feel that I could, I have a right to say that this person should be killed.

Q All right. Let me go into that, ma'am. What you are saying, the fact, in other words this case is now a mandatory life or death, I mean that is, what you are telling me, if it will we need to know, apparently what you are telling me that will affect your deliberations. In other words you could give somebody a term in the penitentiary but in a case, you don't believe that mandatory death, you are telling me that would affect probably your decision or deliberations on issues of fact, is that what you are saying?

A I suppose so.

Q So you are telling me that regardless of a case you just don't believe, regardless of the facts of a case you don't believe that you could come back with death or where the sentence was mandatory life or death, in other words regardless of the facts you are telling me that you believe a person should be punished but you don't believe the death penalty should be in effect?

A I really don't.

Q And it would affect your deliberations on issues of fact in this case, you knowing that?

A I am sure it would.

Q Okay. I thank you, ma'am, for your honesty and appreciate your answers and respect the way you do believe. You have told me that it would affect you, we have other people say this. Of course lots of people feel like they cannot be on a case and it would affect their deliberations on issues in this case and we thank you. We ask she be excused.

MR. CLARKSON: Your honor, we would like to take her on a short cross-voir dire on this particular question. We are not sure if the witness has stated that it will affect her in the sense she considers the gravity of the death penalty or does she mean she couldn't consider death at all. We would like to ask some questions on that.

THE COURT: I think I understand her answers sufficiently to make a ruling. I will sustain the state's challenge for cause.

MR. CLARKSON: Note our exception to that.

\* \* \* \* \* \*

*Mrs. Bert E. Mann :*

Q (By the prosecutor): \* \* \* [W]e need to know and I need to know on behalf of those people whom I represent, certain people have certain feelings about the death penalty and I am required by law to ask you certain questions. In other words some people don't believe in it, they can't give it and that is their right. We respect that belief, that is what they feel. Others say they can give it and will if the facts warrant it in a case, a certain case. Basically I need to start off by telling you a sentence of life imprisonment or death is mandatory in a capital felony case and will the mandatory penalty of death or life imprisonment, will that affect your deliberations on any issue of fact?

A Yes, sir, I am afraid it would.

Q Okay. I appreciate your honesty, that is your belief and we have had several people who said they could not give the death penalty and I respect that belief and you understand it wouldn't be fair for you to be on the jury if you had that in mind, that was one of the penalties and so you are against the death penalty?

A Yes, sir. I have really done some soul searching and really thought about this a lot.

Q You don't know of any circumstances that you could give the death penalty, in other words you are against it?

A Yes, sir, I am.

Q Okay. And it would affect your deliberations on an issue of fact, that's what you are telling us?

A Yes, it would.

Q And certainly I appreciate your honesty and your belief in that and you realize that being honest with us saves us a lot of time and lots of worry because it's time to tell us now that you cannot under any circumstances, rather than going back there when you get in the jury room and I thank you for your time. Judge, we ask this juror be excused for cause.

THE COURT: All right. I will sustain your challenge for cause.