Jack E. ALDERMAN, Petitioner,

v.

Sam AUSTIN, Warden, Georgia State
Prison, Respondent.

CV480–178.

United States District Court,
S. D. Georgia,
Savannah Division.

Sept. 9, 1980.

Bruce H. Morris, Devine & Morris, Atlanta, Ga., American Civil Liberties Union, Atlanta, Ga., for petitioner.

Mary Beth Westmoreland, Atlanta, Ga., for respondent.

## ORDER

B. AVANT EDENFIELD, District Judge.

Before the Court is a Petition for Writ of Habeas Corpus for review of the Judgment of the Superior Court of Chatham County, Georgia, and the conviction and sentence of

death imposed upon Petitioner. Numerous arguments have been raised by Petitioner in his original complaint and by more recent amendment, but the Court will review only two here: (1) the problem created by the trial court's exclusion of three possible jurors based on their unwillingness to sign a verdict of death if elected foreman; and (2) certain comments made by a prosecution witness in reference to Petitioner's statement that he wished to remain silent and consult with an attorney before answering any further police inquiries. For reasons discussed below, it is the holding of the Court that these arguments be upheld. Therefore, Petitioner's conviction and sentence of death must be reversed and the case remanded for a new trial on all issues.

### Background

Petitioner was indicted by the Superior Court of Chatham County for the murder of his wife, Barbara J. Alderman. After a jury trial in 1975, Petitioner was found guilty and sentenced to death. The issues here considered related primarily to violation of Mr. Alderman's constitutional rights in the conduct of this trial and not to the sufficiency of the evidence. The Court will therefore delay discussion of the details of the crime until it becomes necessary for application of these principles. I note here only that there was evidence to support the jury's finding of guilt. There was also basis for its further finding that death was an appropriate penalty based on statutory aggravating circumstances in that the murder was "committed for the purpose of receiving money or any other thing of monetary value" and that the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1(b)(4) and (7).

On direct appeal, the Georgia Supreme Court affirmed Petitioner's conviction and sentence. *Alderman v. State*, 241 Ga. 496, 246 S.E.2d 642 (1978), *cert. denied*, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1979). Petition for Writ of Certiorari was denied by the United States Supreme Court on November 27, 1978, and a petition for rehearing was denied on January 15, 1979.

Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of Chatham County, which was denied on June 4, 1979. On September 6, 1979, the Supreme Court of Georgia denied Petitioner's Application for a Certificate of Probable Cause to Appeal the denial of the Writ of Habeas Corpus. Thereafter, Petition for a Writ of Certiorari was sought in the United States Supreme Court. This petition was denied on February 19, 1980, and a rehearing was denied on March 19, 1980.

Petitioner brought the present habeas corpus action in this Court on June 27, 1980. Application for a stay of execution was granted by the Court, also on June 27, 1980, without objection from the State, so that issues raised by Petitioner could be considered. By way of written memoranda and in a hearing held July 17, 1980, various points have been raised. Of the fifteen grounds now before the Court, I will consider here only the two mentioned above: (1) the exclusion of possible jurors based upon their attitudes toward capital punishment, and (2) comments made at trial on Mr. Alderman's statement that he wished to remain silent and consult an attorney. Since I find these issues determinative, it will be unnecessary to review other arguments.

### The Witherspoon Problem

Petitioner first alleges that the jury which convicted him failed to include a true cross–section of the community because prospective jurors were improperly excluded based on only their general scruples against capital punishment. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Three veniremen are involved in this allegation—Mrs. Maxine M. Cleveland, Mr. Cleveland Barnes, and Mr. William A. Kearney, Jr. All three indicated that they would not be able to write out and sign a verdict of death if elected foreman. They were then excluded from the jury for cause.

Respondent claims that each of these veniremen expressed an unconditional reservation to the imposition of the death penalty such as would support exclusion. However, a careful examination of their statements does not support this interpretation. Mrs. Cleveland initially noted that she could vote to inflict the death penalty. VDT 105–106. The prosecution then asked Mrs. Cleveland if she were selected as foreman, "Could you, as foreman of the jury, following the instructions given you by Judge Cheatham, write out the verdict on the indictment and sign your name to it as foreman?" VDT 106. Mrs. Cleveland responded, "I don't know. I don't think I could do that." She went on to say, "I don't know. I just wouldn't want to convict anybody. I'd feel guilty." VDT 106. She concluded that "this would be on my conscience. I just couldn't write it out." VDT 107. The Court then excluded Mrs. Cleveland for cause.

Mr. Barnes stated that a person found guilty should be punished. VDT 125. The prosecution then asked Mr. Barnes if he were elected foreman "could you write out on the verdict, following the Court's instructions, 'We, the jury recommend that the defendant be put to death,' and sign your name to it. . . ." VDT 126. Mr. Barnes responded, "I couldn't do that." He continued, "I mean, I wouldn't want to just say—you know, put him to death, me." The Court explained that "It wouldn't be you. You'd be signing it as foreman. You wouldn't be signing it as yourself. You'd be signing it as foreman. Could you do that if you were elected foreman?" Mr. Barnes responded, "I don't think I could. No, sir." VDT 127. The Court then excluded Mr. Barnes for cause.

Mr. Kearney stated that he could vote for the death penalty if he believed it was an intentional killing. When asked if he could write out a verdict and sign it if elected foreman, he responded, "I don't believe I could." He further stated, "Well, I have no legal reason, but although I'd vote for the death penalty, I don't believe I could sign a man's life away . . . someone has got to do it. I understand that. But I just don't believe that I could sign it." VDT 138. The Court then excluded Mr. Kearney for cause.

Obviously, all three prospective jurors displayed complex, perhaps even contradictory, attitudes toward the death penalty in these colloquies. Such attitudes are perhaps neither unusual nor unexpected when one faces the difficult problem of putting abstract ideas on the rightness of capital punishment into actual practice with respect to a real defendant. However, in *Witherspoon* the Supreme Court fashioned an unambiguous rule for considering these often quite ambiguous views. The Court held that general inquiry into personal, conscientious scruples against capital punishment could not form a permissible basis for exclusion from a jury deliberating the fate of another human being.

> It cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' thereby affirms that he could never vote in favor of it or that he would not consider doing so in a case before him . . . Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed.
>
> 391 U.S., at 515 n. 9, 88 S.Ct., at 1773 n. 9 (citations omitted).

The Supreme Court thus held that exclusion of prospective jurors was proper only when it was "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence . . . or (2) that their attitudes toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." 391 U.S., at 522, n.21, 88 S.Ct., at 1777 n.21 (emphasis in the original). Succeeding opinions have not retreated from this holding. In *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1968), the Court remanded a case in which veniremen

were dismissed based on a statute excluding persons with "a fixed opinion against capital punishment." The Court there relied explicitly on the footnote material quoted above. In *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), the court remanded for consideration of a *Witherspoon* problem not previously raised but apparently discernable in the record. See also *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1977).

Moreover, the Court has not been reluctant to apply *Witherspoon* in many situations where elements supporting the initial logic of the decision are apparently not present. Of particular interest here is the case of *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). In a *per curiam* opinion the Court rejected the attempt of the Georgia Supreme Court to distinguish *Witherspoon* on grounds that only one prospective juror had been improperly rejected and thus, there had been no "systematic and intentional exclusion" as *Witherspoon* had contemplated. Again quoting *Witherspoon* in part, the Court held that "[u]nless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings,' he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand." 429 U.S., at 123, 97 S.Ct., at 400. Moreover, the Court cited in this connection several prior reversals of the death penalty where only one juror was improperly excluded. See *Wigglesworth v. Ohio*, 403 U.S. 947, 91 S.Ct. 2284, 29 L.Ed.2d 857 (1971), rev'g 18 Ohio St.2d 171, 248 N.E.2d 607 (1969); *Harris v. Texas*, 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 859 (1971), rev'g 457 S.W.2d 903 (Tex.Cr.R.1970); *Adams v. Washington*, 403 U.S. 947, 91 S.Ct. 2273, 29 L.Ed.2d 855 (1971), rev'g 76 Wash.2d 650, 458 P.2d 558 (1969). Nor is there any reason to suppose that the Court's resolve has in any way weakened in more recent opinions. See *Adams v. Texas*, — U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

The breadth and tenor of these opinions has not been lost, least of all to critics on the Court. Thus, Justice Rehnquist, in his dissent in *Davis, supra*, bemoans the Court's "extension of *Witherspoon* to ... a *per se* rule that precludes application of even the harmless–error test of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." 429 U.S., at 123–24, 97 S.Ct., at 400. Moreover, the Fifth Circuit has also noted the very broad application that the Supreme Court now gives to *Witherspoon*. In *Burns v. Estelle*, 592 F.2d 1297, (5th Cir. 1979) the Court summarizes the Supreme Court precedents as follows:

1. Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds. A mere disbelief in it, or even "conscientious or religious scruples against its infliction" will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law.

2. No jury from which even one person has been excused on broader *Witherspoon*–type grounds than these may impose a death penalty or sit in a case where it may be imposed, regardless of whether an available peremptory challenge might have reached him. 592 F.2d, at 1300 (footnote omitted).

Applying this analysis to the present facts, the Court must conclude that *Witherspoon* was violated by exclusion of the three jurors in question. Examination of their statements clearly reveals that none expressed the absolute, unambiguous opposition to the death penalty in all circumstances that *Witherspoon* requires. In fact, all stated that they could vote for the death penalty in proper circumstances, and none retreated from this view in later questioning. What they did express was only a general, personal reluctance to sign a verdict as foreman. This reluctance is understood easily enough. Indeed, one would hope that no juror could approach a capital case without such a feeling of the magni-

tude of his responsibility. But, these doubts do not, insofar as the record reveals, approach the total, unambiguous rejection of the death penalty required under *Witherspoon.*

In fact, counsel for respondent does not really dispute this Court's conclusion. Upon oral argument July 17, 1980, it was alleged only that the prospective jurors' answers revealed a "distinct possibility" of total opposition to the death penalty in all circumstances. Counsel argued only that these veniremen did not "exactly express" such opposition and that the Court could "reasonably" or "arguably" find such opposition based on their replies. Obviously, under *Witherspoon,* these claims are simply insufficient. A juror must indicate "unambiguously" that he would oppose the death penalty "automatically." As counsel implicitly acknowledged, no such finding is possible here.[1]

Finally, the Court notes that Respondent has attempted to avoid the impact of this apparent *Witherspoon* error by arguing that it was in any event harmless. Respondent asserts that, because the prosecution had three unused peremptory challenges, it may be safely supposed that these jurors would have been excluded by the State in any event. In support of this view, it is pointed out that the prosecution had used a peremptory challenge to strike one juror with views similar to those here in issue. Thus, this Court is asked to conclude that the same would have been done with respect to the three jurors who were actually stricken for cause.

Considering the legal basis for a finding of harmless error under these facts, Respondent relies principally upon a single phrase from the dissent of Mr. Justice Rehnquist in *Davis, supra,* "[S]urely *Witherspoon* does not decide whether the presence of unexercised peremptory challenges might render harmless the improper exclusion of a limited number of veniremen." 429 U.S., at 124, 97 S.Ct., at 400. Thus, this Court is asked to conclude that the question of harmless error remained open and the use of the peremptory challenges was at least a strong enough possibility to support denial of relief under the present facts.

This Court cannot agree with either the logic of the State's factual argument or the legal analysis which underlies it. Jury selection is, of course, carried out in many different ways from one case and court to the next. Petitioner's counsel indicates that in the present case, the prosecution was allowed to question jurors only individually, and to accept or reject them one at a time. There was never an opportunity to review the entire panel and use available challenges on any basis of overall preferences. Therefore, at the point when one or more of the three disputed veniremen were in fact questioned, the prosecutor may have had good reason to prefer to save his available challenges for use later against some possibly more objectionable persons. But, in any event, this Court must note that the State's argument cannot amount to more than mere supposition. *Witherspoon,* of course, requires that exclusions be based on the unambiguous and explicit, not a mere hypothesis that the prosecutor would use his challenges because to do otherwise would have been unwise or unlikely.

With respect to the legal basis for a finding of harmless error, this Court is similarly unable to follow the logic suggested by the respondent. As I have already noted, the Fifth Circuit has specifically concluded that the availability of peremptory challenges

---

1. At best, it would seem that the *voir dire* here at issue did not reveal any unwavering opposition to capital punishment. Instead, the jurors in question were asked particularly if they could fulfill the role of foreman in addition to their general responsibility as jurors. This Court is unaware of any statute which demands that a juror serve as foreman, if elected. But, even were such a duty present, it is difficult to see how it could form a proper basis for exclusion. As the Supreme Court has recently reiterated, exclusion can be based only on views that would preclude following an oath to "well and truely [*sic*] try this case ... and follow the law." *Adams v. Texas, supra.* Opinion of the Court, — U.S. at ——, 100 S.Ct. at 2526. There is no suggestion that any broader basis such as willingness to perform the additional leadership functions of foreman is permissible. *Id.,* at ——, 100 S.Ct. at 2527.

does not cure a *Witherspoon* error. *Burns v. Estelle, supra,* at 1300. Even were this analysis not available, I could reach no other view. Respondent would find this question still open based upon one phrase isolated from a dissenting opinion, but even these brief remarks do not support the conclusion drawn. Quite the opposite, Justice Rehnquist specifically notes in his preceding paragraph, which this Court quoted above, that *Davis* creates in effect "a *per se* rule that precludes application of even the harmless–error test . . . ." 429 U.S., at 123–24, 97 S.Ct., at 400. Respondent relies on what Justice Rehnquist contends *Witherspoon* did not decide, not on what he explicitly acknowledges *Davis* did determine. Moreover, *Davis* explicitly cites among prior cases where *Witherspoon* forced reversal of a death sentence, *Harris v. Texas,* 457 S.W.2d 903 (Tex.Cr.R.1970). In *Harris* one juror was improperly excluded and the State had four unused peremptory strikes. To be sure, the Supreme Court's reversal in *Harris* was summary in nature; but, nonetheless, it is hardly accurate to say that the problem has never been faced.

### The Doyle–Hale–Miranda Problem

*Witherspoon* and the related cases discussed above clearly establish that the sentence of death returned against Petitioner cannot stand. However, none of these decisions carries any companion holding that the jury's verdict as to guilt must also fall. In fact, *Witherspoon* specifically reserves this question. 391 U.S., at 518, 88 S.Ct., at 1775. Therefore, this Court must consider other arguments which attack the basis on which this verdict was returned. Of particular concern to the Court are the problems created by an exchange at trial between the prosecutor and a GBI Agent who had questioned Petitioner shortly after the discovery of Mrs. Alderman's body.

The decedent was found in a partially submerged car at Dasher's Creek in Effingham County. She was then taken to Effingham County Hospital where Petitioner was brought to identify her. Following this identification, Petitioner was taken to the sheriff's office and interviewed. With respect to this interview, the following testimony was received at trial:

"Q. [By the Prosecutor] Was Mr. Alderman in custody at that time, under arrest, or were you simply discussing with him this unfortunate occurrence?

"A. [By GBI Agent Keadle] At first, we were simply discussing it and trying to find out a little bit of background, when he had last seen her (his wife) and one thing and another like that when the interview began.

"Q. Sir.

"A. When the interview began, we were trying to run down some preliminary things, when he had last seen her, you know, the routine things that you would on an investigation; that was when the interview began. Of course, it wasn't until the termination of the interview that the stains I mentioned earlier were noticed.

"Q. Mr. Keadle, when you observed these stains that you have referred to, these reddish–brown stains on Mr. Alderman's trousers and I believe you said something similar in appearance on his belt, did you call these to his attention or discuss it with him or ask him what it was or anything?

"A. Shortly before that, we, of course as I said we began with the preliminary just trying to get the background for the investigation started. How long it had been since he had seen her and one thing and another like that, and then toward the end of the interview, he became sort of frustrated with the nature of the questions being asked him, and he decided at that time he would exercise his right to an attorney, and so at that time the interview was just terminated when he stated that he wished to remain silent. He was asked no questions regarding the stains; he was merely informed by me that I was seizing his clothing as evidence." T. 111–112.

No objection was made to either the district attorney's question or to the GBI agent's response; nor was any cautionary

instruction sought.[2] However, in his enumeration of error on appeal and thereafter, Petitioner has contended that the final response by Agent Keadle amounted to an impermissible comment on his proper recourse to rights guaranteed under the Constitution. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This argument presents more difficult questions of law and fact than the *Witherspoon* question considered above. Nonetheless, upon review of all relevant information, the Court finds that this argument must also be sustained.

Respondent contends that *Doyle* and *Hale* are inapplicable to the present facts or, at least, that any error must be considered harmless. However, a threshold question must be considered. The Georgia Supreme Court at least appeared to hold that any objection Petitioner may have had was waived by failure to object at trial.[3] On this basis, Respondent has argued that Petitioner's objection is not now subject to review on the merits before the Court. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *Sykes* rejects the sweeping language of *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1962). *Fay* rendered a state's timely objection rule ineffective to bar review of underlying federal claims in federal habeas corpus proceedings absent a show of "knowing waiver" or a "deliberate bypass" of the right to the objection. In its place, *Sykes* announces a "cause" and "prejudice" test, which must be met before review is permitted. However,

this Court is unable to conclude that *Sykes* is applicable to the present facts.

The language of the Georgia Supreme Court in *Alderman* makes it unclear whether waiver was in fact relied on. But, even were Petitioner's argument properly waived with respect to his original appeal, no such waiver can explain the rejection of his subsequent state habeas corpus petition. The state habeas corpus statute clearly adheres to an "intentional abandonment" test:

> Except for objections relating to the composition of a grand or traverse jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment was participated in by the party and was done voluntarily, knowingly, and intelligently.

Ga.Code Ann. § 50–127(1) (1979 Rev.). See *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937). See also 241 Ga., at 516, 246 S.E.2d 642 (dissenting opinion of Justice Hill); *Jacobs v. Hooper*, 238 Ga. 461, 233 S.E.2d 169 (1977); *Morgan v. Kiff*, 230 Ga. 277, 196 S.E.2d 445 (1973). There is no hint anywhere of conduct by Mr. Alderman which would meet this test. *Sykes* deals "only with contentions of federal law which were *not* resolved on the merits in a state proceeding due to respondent's failure to raise them as required by state procedure." 433 U.S., at 72, 97 S.Ct., at 2507. It creates no bar to independent determination in the federal tribunal where the merits were reviewed by the state court. *Id.* Here there must have been such

**2.** The defense did conduct the following questioning on cross–examination of Agent Keadle:

> Q. You stated that you started questioning him and you ended the questioning when he became frustrated. Do you see anything unusual about a man just having identified his wife as being a dead person on a slab and him to be frustrated.
> A. No, sir.
> Q. Have you run into that on many occasions where you have had to call the husband or loved one in to identify the body?
> A. That is correct.

> Q. Is it unusual that it takes a period of time for them to regain their composure before they can actually even say anything?
> A. Probably so. (T. 176).

**3.** The Georgia Supreme Court held as follows: "Appellant's failure to object below to the admission of the complained of testimony constitutes a waiver and appellant cannot now complain on appeal. Notwithstanding, even if considered on its merits . . . ." 241 Ga. at 504, 246 S.E.2d at 648 (citations omitted). Thus, the court appears to state and then immediately "waive" the waiver argument.

a review, if only under the habeas corpus statute. Therefore, the Court can see no basis for declining consideration of Petitioner's argument in the present action.[4]

 Considering Petitioner's objection on its merits, Respondent contends first that the remarks testified to did not occur in a context of "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1976). *Miranda* defines "custodial interrogation" to include not only questioning after formal arrest but when the defendant has been "deprived of his freedom of action in any significant way." 384 U.S., at 444, 86 S.Ct., at 1612. Following *Miranda* and later cases, the Fifth Circuit has developed several criteria for determining when custodial restraint is present. Among these are (1) the subjective intent of the police; (2) the subjective belief of the defendant; (3) whether probable cause for arrest existed at the time of the interrogation; and (4) whether the defendant was the focus of the investigation. *United States v. Henry*, 604 F.2d 908 (5th Cir. 1979); *Brown v. Beto*, 468 F.2d 1284 (5th Cir. 1972).

These criteria are, of course, intended to facilitate rather than replace case-by-case analysis. 604 F.2d, at 915. However, in considering the particular situation here at issue much of the most important information is not clearly specified. The Court finds no definite indication in the record of when Petitioner's *Miranda* rights were read to him. Neither does the Court have precise information concerning when the blood stains were noticed on Petitioner's clothing. These facts would go far toward establishing when probable cause and other signifi-

cant indices of custodial interrogation were present. But, nonetheless, examination of all the known circumstances surrounding the disputed interview convinces the Court that the Petitioner was clearly the subject of "custodial interrogation" within the meaning of *Miranda*.

The Court notes first that this case was never characterized by police as any mere accident. Quite the opposite, Sheriff Fulcher testified that he suspected "foul play" from the moment Mrs. Alderman's body was removed from the car. T. 50. In fact, his first action was to call the GBI for assistance in a *criminal* investigation. *Id*. Almost immediately after discovering the wreck, Sheriff Fulcher also asked police in Garden City, where Mr. Alderman lived, to assist in locating him. The Garden City Police found Petitioner at his apartment later in the evening and stayed with him until the sheriff could dispatch two deputies. These deputies took Petitioner to the hospital where he identified Mrs. Alderman.

Perhaps the actions of these officers could be attributed in some part to normal police procedure. But, taking Petitioner directly from the hospital to the sheriff's office after at most five minutes and without opportunity to communicate with friends or relatives hardly suggests that he was being treated as a bereaved husband and not a suspected felon. T. 107. There is certainly no suggestion and no reason to believe that Petitioner volunteered for this attention, or that he would have been permitted to go elsewhere had he wished.[5]

Moreover, even if Petitioner was not technically under arrest when the interview began, he certainly was when it was over.

---

4. Even were *Sykes* applicable, there is at least some allegation of "cause" in Petitioner's claim of ineffective counsel in his state appeal. This argument was explicitly waived by the Petitioner in *Sykes*. 433 U.S., at 75 n.4, 97 S.Ct., at 2500 n.4. In the present case, however, the issue was raised but addressed in only the most cursory fashion despite a statutory requirement of plenary review. Ga.Code Ann. § 27–2537 (1978 Rev.). In addition, the *Sykes* requirement of "prejudice" seems adequately vindicated by the exception under *Doyle* and *Hale* for harmless error.

5. Mr. Alderman testified that police held him in custody from the time he was picked up at his apartment. Upon cross-examination, he also indicated that *Miranda* was never read to him. T.700. Mr. Alderman also stated that he terminated the interview because of Agent Keadle's abusive language and direct accusations that he had murdered Mrs. Alderman. T.639,700. Aside from Agent Keadle's characterization of the disputed interview as "preliminary," no testimony contradicted Petitioner's description of the circumstances surrounding his arrest.

Immediately after he became "frustrated" and refused to speak further, Petitioner was formally arrested. He was then taken directly to a cell, and his clothing seized as evidence. T. 112. Thus, it is obvious that the investigation and the interview did at some point prior to his invocation of Miranda "focus" on Petitioner sufficiently for his freedom to be significantly curtailed. No matter when Agent Keadle was informed about the stains, it must have been before the questioning completely ended and, therefore, before Petitioner's "frustration."[6] Clearly, no matter when "probable cause" was found, it was there when Petitioner chose to remain silent. Similarly, police must have had a subjective belief in Petitioner's culpability by the time the interview was concluded. It also appears that Petitioner's "frustration" was based on a subjective belief that he was being accused. Why else his request for *legal* assistance?

Considering all these facts, the Court must conclude that Petitioner was under "custodial interrogation" at the time of the disputed interview. Petitioner was in precisely the unfamiliar, police–dominated atmosphere which the Supreme Court warned against in *Miranda*, under precisely the burden of suspicion considered in that case. There was clearly no realistic possibility that police would have permitted him to leave their control had he attempted to do so. He was aware of his *Miranda* rights. He chose to remain silent in reliance on these rights. Reference was made to this decision in Agent Keadle's testimony. I can, therefore, find no basis for denying application of *Hale* and *Doyle*.

■ However, inquiry does not stop here. Even though *Doyle* and *Hale* were violated,

this can be a basis for reversal only when the error is not "harmless." For an error to be harmless, it must appear to the Court beyond reasonable doubt that the evidence complained of did not contribute to the Petitioner's conviction. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This difficult standard was found met by the Fifth Circuit in *Chapman v. United States*, 547 F.2d 1240 (5th Cir. 1977). In that case, the court relied upon several factors. There was only a single reference at trial to defendant's silence. That reference was neither made nor elicited by the prosecution, but instead resulted from a witness's spontaneous remark. The reference was neither repeated nor linked to defendant's exculpatory story. Furthermore, the court found that this story was "transparently frivolous" and the evidence of guilt was otherwise overwhelming. 547 F.2d, at 1250. See also *United States v. Sklaroff*, 552 F.2d 1156, 1162 (5th Cir. 1977). However, *Chapman* also notes that "even a single reference on direct examination to defendant's silence carried an intolerably prejudicial impact, where the defendant's exculpatory story was not totally implausible and the government's inculpatory evidence was not overwhelming." 547 F.2d, at 1249. Moreover, the Court indicates that reversible error can result where prosecutors purposefully employ a defendant's post–arrest silence to defeat even a transparently frivolous exculpatory story. *Id.*, at 1248.

■ Applying these guides to the facts at hand, the Court must conclude that the error complained of was not harmless beyond a reasonable doubt. Mr. Alderman testified that he had quarreled[7] with his wife early in the evening of her death. Later on, he drove his motorcycle to her

---

**6.** Q. Did you observe anything unusual about the appearance of Mr. Alderman's clothing or any part of his clothing at this time?
A. (Agent Keadle) While I was speaking with Mr. Alderman, one of the deputies in Effingham County pointed out to me a reddish brown stain in the seat and the inside of the legs, right in there, a reddish brown stain in there, and that's how I first noticed it. It was pointed out to me by a deputy. T. 110.

**7.** There was no serious argument made at trial that this misunderstanding motivated the slaying. Neither was there any showing of particular marital discord. Instead, it was asserted that Petitioner killed his wife for the proceeds of a $10,000 insurance policy she held as an employee of the City of Savannah. However, there was no hint that Mr. Alderman was in any special need of money. He was regularly employed in a managerial job at a Garden City supermarket. There was no indication that he

grandmother's home believing that Mrs. Alderman had probably gone there. Petitioner claimed that he saw the family car with lights on in the creek near the grandmother's house. His pants became stained when he went down from the road to investigate and, subsequently, put her head in his lap. However, the shock of the discovery and fear of his in–laws' reaction caused him to flee the scene almost immediately and to block all recollection of the event out of his mind for some time thereafter.

Obviously, Petitioner's explanation is not easily accepted.[8] However, it does not appear that the inculpatory evidence in the present case was nearly so overwhelming as was true in *Chapman.* There police discovered the defendant holding a crowbar wedged in the front door of a bank. He explained only by claiming that he was recovering his crowbar after it had been placed there by two unidentified hitchhikers to whom he had loaned his car. In the present case the major direct link of Petitioner to the crime was the testimony of John Arthur Brown, an acquaintance and alleged accomplice who, quite unlike Peti-

tioner, had a long history of drug abuse and mental instability. T. 383. This witness admitted to experiencing periods when he could not distinguish reality from fantasy and other occasions when he drank so heavily that he was unable to recall what he had done. T. 393. He also indicated that he had used numerous drugs the night before the crime, and consumed at least sixteen drinks the evening of the alleged murder. T. 454.

Even though Petitioner's story is hardly subject to easy understanding, many aspects of Brown's account were similarly open to doubt. For example, he testified that he stalked Mrs. Alderman around a small apartment for over half an hour holding the twelve–inch crescent wrench allegedly used to strike her without arousing suspicion or even curiosity in the decedent. T. 431. Brown also described a violent struggle during which Mrs. Alderman was first struck on the head with this wrench.[9] She was then tackled by Mr. Alderman and knocked to the floor after Mr. Brown's blow proved inadequate. Brown stated that he and Petitioner then strangled her into un-

had a criminal record or was otherwise in any trouble.

**8.** It should be pointed out that Mr. Alderman's story was supported by the testimony of an expert witness. This doctor concluded that Petitioner had suffered a "dissociative reaction" caused by the shock of the discovery. This reaction was, the psychiatrist concluded after examination of Mr. Alderman, the cause of his selective amnesia. Petitioner's account also comports with police descriptions of the bloodstains on his clothing as light and "watery." T. 65, 174. Moreover, this state of "shock" seems to account for the fact that Petitioner did not simply remove his wet, stained, and obviously highly incriminating clothing. Certainly he had ample opportunity. Mrs. Alderman was discovered around 11:00 P.M. T. 27. Mr. Alderman was found at his apartment around 3:00 A.M. T. 236. Thus, he had several hours to change clothes, and he was not unaware of the problem. According to his chief accuser Brown, he had already changed once after his clothing was bloodied in the struggle to subdue Mrs. Alderman. T. 346. (There was apparently no attempt made to locate the clothing allegedly worn during the struggle to subdue Mrs. Alderman. Nor did police perform any tests on the clothing Mr. Brown put on after the murder to determine whether it too was

stained. Brown indicated that it was still in his jail cell when he took the witness stand. T. 440.) Furthermore, the prosecution accorded the account sufficient weight to justify questioning the expert about his use of hypnosis in direct disregard of the order of the trial court that it not be brought up in any way. The prosecution asked Dr. Smith, the defense expert witness, whether hypnosis had been used and whether it could be "faked." Both answers were in the affirmative. When the defense sought to question the witness on techniques that had been used to detect "faking," the trial judge enforced its earlier pronouncement, and refused to allow specific questioning by the defense. T. 736. Error is claimed on the basis of this ruling. However, because I find *Doyle* and *Hale* dispositive, the issue is not reached below.

**9.** A wrench such as Brown described was found among Petitioner's tools after the alleged crime. However, no tests were ever performed on it to determine whether it might have been used to strike Mrs. Alderman. There was also no explanation for why she was not rendered unconscious or at least much more severely injured when Brown struck her on the head with this presumably quite heavy implement.

**1144**

consciousness and placed her in the apartment bathtub where she was drowned. However, the state medical examiner found no indication whatever of strangulation. He also indicated that it was all but impossible for Mrs. Alderman to have been attacked as Brown described without leaving some such evidence. T. 297. Moreover, the examiner indicated that, while there had been a blow to the decedent's head, it was not of a serious nature, and not sufficient to make him doubt that she was anything other than a typical drowning victim. T. 297. Furthermore, because no tests were ever made on the water in Mrs. Alderman's lungs, there was never firm demonstration that she was drowned in her bathtub and not Dasher's Creek. T. 318.

It is apparent then that significant aspects of the prosecution's case were far from overwhelming. It is also apparent that the state's role in the error complained of was far different from the one described in *Chapman.* Here the witness's statement was in fact produced by the direct inquiry of the prosecution. Far from being spontaneous, it was the result of a carefully-phrased question which obviously attempted to keep the GBI agent's reference to Petitioner's silence outside the protections discussed in *Doyle* and *Hale.* The prosecutor asked, "Was Mr. Alderman in custody . . . or were you simply discussing with him . . . ." The witness replied referring to seeking only "a little bit of background." T. 111. As I have already indicated, the circumstances surrounding this questioning do not at all support an inference of "preliminary investigation." Moreover, the fact that the prosecutor ventured into this area and risked the very result reached here suggests that he did not regard his own case as otherwise "overwhelming."

Finally, the Court must note that the jury which reviewed this evidence was already tainted by the *Witherspoon* error noted above. It was not an impartial cross-section of the community. Instead, three persons who exhibited particular sensitivity to the gravity of the juror's responsibility were improperly excluded. The Court must therefore evaluate not merely the possible impact of the improper reference on the actual panel but on one that was never in fact developed. The Court must consider the role of the prosecution in the error and the nature of the evidence presented, all in the context of the *Witherspoon* problem. In the face of all these facts, I cannot conclude that no "reasonable doubt" exists as to the harmlessness of the disputed testimony. In these circumstances, I must also reverse and remand for retrial on the issue of guilt.

*Conclusion*

Petitioner was convicted of what was apparently a brutal murder. The Court has no occasion now to say whether he was in fact guilty of this crime. I do find that his trial was fatally defective in two respects. First, the jury which considered the evidence was not selected in a way which brought a true cross-section of the community into the deliberations. Secondly, the evidence which the jury reviewed included a clear, impermissible, and not clearly harmless reference to Petitioner's recourse to rights guaranteed him under the Constitution. Petitioner's conviction and sentence of death are therefore reversed. He is hereby remanded to the Superior Court of Chatham County for retrial on all issues or release within one hundred and twenty days.