Jack E. ALDERMAN, Petitioner-Appellee,

v.

Sam AUSTIN, Warden, Georgia State Prison, Respondent-Appellant.

No. 80–7820.

United States Court of Appeals, Fifth Circuit.*
Unit B

Dec. 11, 1981.
On Rehearing March 12, 1982.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant.

Bruce H. Morris, Atlanta, Ga., for petitioner-appellee.

Joel Berger, NAACP Legal Defense and Educ. Fund, Inc., New York City, for amicus curiae.

Before MARKEY **, Chief Judge, and HILL and THOMAS A. CLARK, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Jack E. Alderman was indicted, tried, convicted, and sentenced to death by electrocution for the 1974 murder of his wife, Barbara J. Alderman. Following unsuccessful direct attacks[1] upon his conviction and sentence, Alderman petitioned through the state court system for writ of habeas corpus. These collateral attacks too failed. But upon Alderman's petition for federal

---

** Honorable Howard T. Markey, Chief Judge for the U.S. Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. *Alderman v. State*, 241 Ga. 496, 246 S.E.2d 642, *cert. denied*, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978).

relief, *see* 28 U.S.C. § 2254 (1976), the United States District Court, Southern District of Georgia, granted the writ. We affirm in part, reverse in part, and remand, 498 F.Supp. 1134.

## I.

Petitioner, on September 19, 1974, approached his close friend John A. Brown for assistance in murdering petitioner's wife. Petitioner offered Brown compensation: the two were to split the proceeds of Mrs. Alderman's life insurance policy. Several days hence petitioner summoned Brown to the Aldermans' apartment, handed him a 12-inch crescent wrench, and instructed Brown to hit Mrs. Alderman. Brown was reluctant but was persuaded by the point of petitioner's gun. Brown entered the dining room where Mrs. Alderman stood and struck her head with the wrench. She screamed and ran to the living room only to confront her husband who brought her to the floor and held her down. Petitioner and Brown began to strangle Mrs. Alderman, stopping only after she passed out. Petitioner then filled a bathtub with water. Mrs. Alderman was dragged into the bathroom and placed in the tub with her face submerged.

The two men left the apartment for several hours. When they returned, they removed Mrs. Alderman's body from the tub, rolled it in a quilt, and placed it in the trunk of her car. Brown drove the car; petitioner followed on a motorcycle. Alongside a creek in Rincan, Georgia, the body was taken from the trunk and placed in the driver's seat. The car brake was released allowing the car to roll into the creek where it and the body were soon discovered.

At trial, petitioner denied he killed his wife.[2] His testimony was that he quarreled with his wife on the evening of her death.

Later that evening, he drove his motorcycle to her grandmother's house in search of her. On the way, petitioner testified, he passed the Rincan, Georgia creek and observed the family car in it. He went down to the creek, saw his deceased wife, cradled her head in his lap thereby staining his clothing with the blood later noticed by police, and fled the scene in shock and fear.

The jury determined guilt accompanied by two statutory aggravating circumstances: (1) Ga.Code Ann. § 27–2534.1(b)(4), *i. e.,* murder "committed . . . for the purpose of receiving money or any other thing of monetary value"; and (2) Ga.Code Ann. § 27–2534.1(b)(7), *i. e.,* murder which was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

Petitioner's habeas corpus action alleges constitutional error, committed by the state court, on two grounds. First, he asserts that jury exposure to a single comment made by a prosecution witness during trial testimony violated the teaching of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) and its lineage. Second, he argues that his jury suffered from defects of the type held violative of due process in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We proceed to analyze the facts and law involved in these contentions.

## II.

At petitioner's state court trial, the prosecution called Georgia Bureau of Investigation special agent H. H. Keadle to testify concerning Keadle's interview with petitioner held shortly after petitioner had identified his wife's body at the Effingham County, Georgia, Hospital. The relevant testimony[3] contained a single reference by Keadle to the fact that petitioner, at one point in the interview, had expressed his

---

2. Amplification of petitioner's defense may be found in *Alderman v. State,* 241 Ga. at 498–99, 246 S.E.2d at 644.

3. Q. Now after Mr. Alderman was taken from the hospital to Sheriff Fulcher's office, did

you interview him at Sheriff Fulcher's office?
A. Yes, sir.
Q. Was Mr. Alderman in custody at this time, under arrest, or were you simply discussing with him this unfortunate occurrence.

wish to exercise the right to an attorney and to remain silent. Keadle's reference was neither solicited by the prosecutor, objected to by the petitioner's attorney, nor mentioned again in the course of trial.

Petitioner first raised this issue on direct appeal to the Supreme Court of Georgia, which was unimpressed with it on several levels.[4] Petitioner argues here, as he did with success in the district court, that he was under "custodial interrogation," *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), at the time of his interview with Agent Keadle. Such being the case, his exercise of guaranteed constitutional rights was permitted to haunt him at trial.

The district court studied the evidence and found the alleged constitutional error harmful. We disagree. The standard em-

A. At first, we were simply discussing it and trying to find out a little bit of background, when he had last seen her and one thing and another like that when the interview began.

Q. Sir?

A. When the interview began, we were trying to run down some preliminary things, when he had last seen her, you know, the routine things that you would on an investigation; that was when the interview began. Of course, it wasn't until the termination of the interview that the stains that I mentioned earlier were noticed.

Q. Mr. Keadle, when you observed these stains that you have referred to, these reddish-brown stains on Mr. Alderman's trousers and I believe you said something similar in appearance on his belt, did you call these to his attention or discuss it with him or ask him what it was or anything?

A. Shortly before that, we, of course as I said we began with the preliminary just trying to get the background for the investigation started, how long it had been since he had seen her and one thing and another like that, and then toward the end of the interview, he became sort of frustrated with the nature of the questions being asked him, and he decided at that time he would *exercise his right to an attorney, and so at that time the interview was just terminated when he stated that he wished to remain silent.* He was asked no questions regarding the stains, he was merely informed by me that I was seizing his clothing as evidence.

ployed by the district court, purportedly but incorrectly drawn from *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), explains the court's mistaken impression that the error was not harmless. *Chapman* held that:

> When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, *i. e.*, when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is *not totally implausible* or *the indicia of guilt not overwhelming.*

547 F.2d at 1249 (emphasis added). The district court relied on similar language,

4. The Supreme Court of Georgia dealt with this issue in a somewhat alternative fashion. The Court affirmed on Georgia's "contemporaneous objection" rule, which permitted the conclusion that "Appellant's [petitioner's] failure to object below to the admission of the complained of testimony constitute[d] a waiver" regarding which petitioner could not complain on appeal. 241 Ga. at 504, 246 S.E.2d at 648. Perhaps uncomfortable with allowing a "constructive" waiver of a right to result in petitioner's death by electrocution, the Georgia Supreme Court went on to (1) consider the merits of petitioner's *Doyle v. Ohio*, claim, adjudging it nonmeritorious; and (2) determine that even if the claim did amount to constitutional error, that error was "harmless beyond a reasonable doubt," *Id.* at 505, 246 S.E.2d at 649. Georgia Supreme Court Justice Harold N. Hill, Jr. observed that the "majority [of the Georgia Supreme Court] is unsure of its basis for affirming this death penalty." *Id.* at 514, 246 S.E.2d at 653 (Hill, J., dissenting). *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), which flowed directly from the notion of an "adequate state ground," would often operate to preclude federal consideration on habeas petition of issues deemed waived by virtue of a state's contemporaneous objection rule. But on direct appeal, the Georgia Supreme Court's "ambivalent" majority opinion, brimming with alternative decisional grounds, leads us to conclude that that court was not convinced of the adequacy of the nonfederal ground on the *Doyle* issue. We, then, likewise are not constrained to defer to that ground.

appearing elsewhere in *Chapman* and describing yet another case, *United States v. Impson*, 531 F.2d 274 (5th Cir. 1976), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 803 (1978), for the proposition that a petitioner's exculpatory theory must be totally implausible *and* the indicia of his guilt not overwhelming. Applying the test conjunctively rather than disjunctively, the district court erred. For in this case, the indicia of guilt clearly *was* overwhelming, and here, as in *Chapman*, the harmless error presented itself in a single, isolated response by a witness during trial testimony. Moreover,

> . . . Neither the prosecutor nor any prosecution witness tied together the fact of [petitioner's] silence with his improbable story. The jury was never told that silence could be used for impeachment purposes. Neither in cross-examination nor in argument did the prosecutor suggest that silence impeached [petitioner's] trial testimony.

*Id. See also United States v. Shavers*, 615 F.2d 266, 270 (5th Cir. 1980). The error here involved is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

█ Petitioner persuaded the federal district court that he had been convicted by a state court jury whose composition was unconstitutional under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Knowing that he intended to ask that petitioner be executed, the prosecutor for the State of Georgia on voir dire probed each venireman as to his views on capital punishment. In order to exclude from the jury those veniremen who would not vote to inflict death, the prosecutor propounded a series of penetrating questions to each. Specifically, the inquiry was whether a venireman regardless of his overall feelings about the death penalty could, if called upon to act as jury foreman, actually sign his name to the verdict. Three prospective jurors were reticent on this point. The colloquy involving one of them is demonstrative:

Q. [A] little while ago . . . you stated that you were not conscientiously opposed to capital punishment. Now, under Georgia law, if you believe from the evidence and the Charge of the Court that the death penalty was called for under the facts of this case, could you vote yes to inflict the death penalty?

A. Yes.

Q. You feel that you could?

A. Yes.

Q. All right, now, going a step further with this . . ., if you were selected to serve as foreman on this jury and the other eleven jurors believed that the evidence and the law required that the death penalty was proper and should be voted for in this case, could you, as foreman of the jury, following instructions given you by Judge Cheatham, write out the verdict on the indictment and sign your name to it as foreman?

A. I don't know. I don't think I could do that.

Q. I beg your pardon?

A. No, I don't believe I could do that.

Q. You don't believe you could do that?

A. No.

Q. Even though the judge instructed that if you believed from the evidence that the death penalty was warranted and you were the foreman of the jury, you could not write it out?

A. No.

MR. DREW: If your Honor please—

THE COURT: Why not?

A. I don't know. I just wouldn't want to convict anybody. I'd feel guilty.

THE COURT: Well, you would have already convicted him and as foreman, it's your responsibility—let us assume that you had convicted him—as foreman, it would be your responsibility to write that out; you say you couldn't do that?

A. No.

. . . .

THE COURT: She has already said that she could vote to convict him . . . . and

could vote to give him the death penalty, but could not write it out. What's the difference in your mind? . . . .

A. I don't know. This would be on my conscience. I just couldn't write it out.

Record, Vol. III, at 936–38. Two other veniremen responded in similar fashion. Following each venireman's expression of inability—as foreman—to sign a verdict that would effect capital punishment of a defendant, the prosecutor moved successfully to strike that venireman from the jury for cause. Petitioner objected to each of the three exclusions for cause on *Witherspoon* grounds.

### IV.

█ The sixth amendment, applicable to the states through the fourteenth, *see Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), guarantees a defendant "[i]n all criminal prosecutions, . . . the right to a speedy and public trial, by an impartial jury . . . ." U.S.Const., amend. VI. In order to ensure the requisite impartiality, the Supreme Court has held that juror selection methods that "produce[ ] a jury uncommonly willing to condemn a man to die," *Witherspoon, supra*, 391 U.S. at 521, 88 S.Ct. at 1776 (footnote omitted), are unconstitutional. Only a venireman who "states unambiguously that he would automatically vote *against* the imposition of capital punishment,"[5] *id.* at 523 n.21, 88 S.Ct. at 1777 n.21 (emphasis added), notwithstanding the evidence introduced by the parties or the law charged by the judge, *can be excluded* constitutionally from jury service in a capital case. Only such a venireman, the Court has said, "would clearly be unable to follow the law . . . in assessing punishment." *Adams v.*

*Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

█ Such however is not the case here. The veniremen at issue evidenced no "unambiguous" intent to oppose capital punishment either in principle or in the trial of this particular petition. They expressed quite the contrary, in point of fact, inasmuch as each articulated an *affirmative* response to the State's direct inquiry into his ability to vote for execution. The state suggests, however, that these veniremen were incapable of discharging their duties since any member of a venire potentially can be called upon to act as foreman and thus to accomplish the very act these three prospective jurors could not conscientiously do, *viz.*, sign the jury verdict that would effectuate electrocution. While the Supreme Court has explicated that a juror holding views on capital punishment that "would prevent or substantially impair the performance of his duties," *id.*, may be excluded, we reject the State's suggestion that service as foreman is among every juror's duties. Moreover, we know of no Georgia law requiring any juror to serve, against his will, as foreman of the jury in any case.

█ It does not appear that these veniremen were incapable of voting in full accord with the evidence, as they viewed it, and with the judge's charge. Whether a venireman could sign, in good conscience, a verdict that would result in a defendant's execution is immaterial to jury service under *Witherspoon*. The action by the state court leaves us, to be sure, "with veniremen . . . excluded on [a] . . . broader basis than" *Witherspoon* and subsequent authority[6] permit, and with a "death sentence [that]

---

**5.** *Witherspoon* did not nor do we confront the question whether an impartial factfinder may determine that a venireman's initial responses to questions on voir dire were false. A penetrating cross-examination of a venireman might, for example, reveal his resolve to sit on a jury in a capital case in order to "veto" a death penalty. Although the trial court in the case sub judice made no such findings, we do not read *Witherspoon* as a blanket prohibition on excluding such a venireman.

**6.** *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

cannot be carried out . . . ."[7] *Witherspoon, supra,* 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21. *Witherspoon, supra,* 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21.

The district court order issuing the Writ, on the basis of *Witherspoon v. Illinois,* is affirmed. Petitioner's existing death sentence shall not be carried out. The district court's finding of harmful constitutional error on petitioner's *Doyle v. Ohio* ground is reversed. The case is remanded for proceedings not inconsistent with this opinion. It is so ORDERED.

AFFIRMED in part; REVERSED in part; REMANDED.

THOMAS A. CLARK, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent with respect to Part II of the majority opinion. There is apparently no dispute between the members of the majority and myself that it was error for GBI agent Keadle to testify that during his questioning of Alderman the latter decided to exercise his right to an attorney and to remain silent. The majority holds that the error is harmless beyond a reasonable doubt and that the district court misconstrued our holding in *Chapman v. United States,* 547 F.2d 1240 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). I find the discussion of the harmless error point by District Judge B. Avant Edenfield very helpful:

Even though *Doyle* and *Hale* were violated, this can be a basis for reversal only when the error is not "harmless." For an error to be harmless, it must appear to the Court beyond reasonable doubt that the evidence complained of did not contribute to the Petitioner's conviction. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This difficult standard

was found met by the Fifth Circuit in *Chapman v. United States,* 547 F.2d 1240 (5th Cir. 1977). In that case, the court relied upon several factors. There was only a single reference at trial to defendant's silence. That reference was neither made nor elicited by the prosecution, but instead resulted from a witness's spontaneous remark. The reference was neither repeated nor linked to defendant's exculpatory story. Furthermore, the court found that this story was "transparently frivolous" and the evidence of guilt was otherwise overwhelming. 547 F.2d, at 1250. See also *United States v. Sklaroff,* 552 F.2d 1156, 1162 (5th Cir. 1977). However, *Chapman* also notes that "even a single reference on direct examination to defendant's silence carried an intolerably prejudicial impact, where the defendant's exculpatory story was not totally implausible and the government's inculpatory evidence was not overwhelming." 547 F.2d, at 1249. Moreover, the Court indicates that reversible error can result where prosecutors purposefully employ a defendant's post-arrest silence to defeat even a transparently frivolous exculpatory story. *Id.,* at 1248.

Applying these guides to the facts at hand, the Court must conclude that the error complained of was not harmless beyond a reasonable doubt. Mr. Alderman testified that he had quarreled[7] with his wife early in the evening of her death. Later on, he drove his motorcycle to her grandmother's home believing that Mrs. Alderman had probably gone there. Petitioner claimed that he saw the family car with lights on in the creek near the grandmother's home. His pants became stained when he went down from the road to investigate and, subsequently, put her head in his lap. However, the shock of the discovery and fear of his in-laws' reaction caused him to

---

7. The state has argued further that because it retained sufficient peremptory challenges to exclude all three veniremen here without cause, the state court's action was in the nature of "harmless error" and thus constitutionally palatable. As *amicus curiae* NAACP Legal Defense & Educational Fund, Inc. correctly points out, we have rejected this position on prior occasion, *Burns v. Estelle,* 592 F.2d 1297, 1300

(5th Cir. 1979), *approved in,* 626 F.2d 396 (5th Cir. 1980) (en banc), and we do so again today. "No jury from which even one person has been excused on . . . [grounds broader than *Witherspoon*] may impose a death penalty or sit in case where it may be imposed, regardless of whether an available peremptory challenge might have reached him." 592 F.2d at 1300.

flee the scene almost immediately and to block all recollection of the event out of his mind for some time thereafter.

Obviously, Petitioner's explanation is not easily accepted.[8] However, it does not appear that the inculpatory evidence in the present case was nearly so overwhelming as was true in *Chapman*. There police discovered the defendant holding a crowbar wedged in the front door of a bank. He explained only by claiming that he was recovering his crowbar after it had been placed there by two unidentified hitchhikers to whom he had loaned his car. In the present case the major direct link of Petitioner to the crime was the testimony of John Arthur Brown, an acquaintance and alleged accomplice who, quite unlike Petitioner, had a long history of drug abuse and mental instability. T. 383. This witness admitted to experiencing periods when he could not distinguish reality from fantasy and other occasions when he drank so heavily that he was unable to recall what he had done. T. 393. He also indicated that he had used numerous drugs the night before the crime, and consumed at least sixteen drinks the evening of the alleged murder. T. 454.

Even though Petitioner's story is hardly subject to easy understanding, many aspects of Brown's account were similarly open to doubt. For example, he testified that he stalked Mrs. Alderman around a small apartment for over half an hour holding the twelve-inch crescent wrench allegedly used to strike her without arousing suspicion or even curiosity in the decedent. T. 431. Brown also described a violent struggle during which Mrs. Alderman was first struck on the head with this wrench.[9] She was then tackled by Mr. Alderman and knocked to the floor after Mr. Brown's blow proved inadequate. Brown stated that he and Petitioner then strangled her into unconsciousness and placed her in the apartment bathtub where she drowned. However, the state medical examiner found no indication whatever of strangulation. He also indicated that it was all but impossible for Mrs. Alderman to have been attacked as Brown described without leaving some such evidence. T. 297. Moreover, the examiner indicated that, while there had been a blow to the decedent's head, it was not of a serious nature, and not sufficient to make him doubt that she was anything other than a typical drowning victim. T. 297. Fur-

thermore, because no tests were ever made on the water in Mrs. Alderman's lungs, there was never firm demonstration that she was drowned in her bathtub and not Dasher's Creek. T. 318.

It is apparent then that significant aspects of the prosecution's case were far from overwhelming. It is also apparent that the state's role in the error complained of was far different from the one described in *Chapman*. Here the witness's statement was in fact produced by the direct inquiry of the prosecution. Far from being spontaneous, it was the result of a carefully-phrased question which obviously attempted to keep the GBI agent's reference to Petitioner's silence outside the protections discussed in *Doyle* and *Hale*. The prosecutor asked, "Was Mr. Alderman in custody . . . or were you simply discussing with him . . . ." The witness replied referring to seeking only "A little bit of background." T. 111. As I have already indicated, the circumstances surrounding this questioning do not at all support an inference of "preliminary investigation." Moreover, the fact that the prosecutor ventured into this area and risked the very result reached here suggests that he did not regard his own case as otherwise "overwhelming."

Finally, the Court must note that the jury which reviewed this evidence was already tainted by the *Witherspoon* error noted above. It was not an impartial cross-section of the community. Instead, three persons who exhibited particular sensitivity to the gravity of the juror's responsibility were improperly excluded. The Court must therefore evaluate not merely the possible impact of the improper reference on the actual panel but on one that was never in fact developed. The Court must consider the role of the prosecution in the error and the nature of the evidence presented, all in the context of the *Witherspoon* problem. In the face of all these facts, I cannot conclude that no "reasonable doubt" exists as to the harmlessness of the disputed testimony. In these circumstances, I must also reverse and remand for retrial on the issue of guilt.

---

[7] There was no serious argument made at trial that this misunderstanding motivated the slaying. Neither was there any showing of particular marital discord. Instead, it was asserted that Petitioner killed his wife for the

proceeds of a $10,000 insurance policy she held as an employee of the City of Savannah. However, there was no hint that Mr. Alderman was in any special need of money. He was regularly employed in a managerial job at a Garden City supermarket. There was no indication that he had a criminal record or was otherwise in any trouble.

[8] It should be pointed out that Mr. Alderman's story was supported by the testimony of an expert witness. This doctor concluded that Petitioner had suffered a "dissociative reaction" caused by the shock of the discovery. This reaction was, the Psychiatrist concluded after examination of Mr. Alderman, the cause of his selective amnesia. Petitioner's account also comports with police descriptions of the bloodstains on his clothing as light and "watery." T. 65, 174. Moreover, this state of "shock" seems to account for the fact that Petitioner did not simply remove his wet, stained, and obviously highly incriminating clothing. Certainly he had ample opportunity. Mrs. Alderman was discovered around 11:00 P.M. T. 27. Mr. Alderman was found at his apartment around 3:00 A.M. T. 236. Thus, he had several hours to change clothes, and he was not unaware of the problem. According to his chief accuser Brown, he had already changed once after his clothing was bloodied in the struggle to subdue Mrs. Alderman. T. 346. (There was apparently no attempt made to locate the clothing allegedly worn during the struggle to subdue Mrs. Alderman. Nor did police perform any tests on the clothing Mr. Brown put on after the murder to determine whether it too was stained. Brown indicated that it was still in his jail cell when he took the witness stand. T. 440.) Furthermore, the prosecution accorded the account sufficient weight to justify questioning the expert about his use of hypnosis in direct disregard of the order of the trial court that it not be brought up in any way. The prosecution asked Dr. Smith, the defense expert witness, whether hypnosis had been used and whether it could be "faked." Both answers were in the affirmative. When the defense sought to question the witness on techniques that had been used to detect "faking," the trial judge enforced its earlier pronouncement and refused to allow specific questioning by the defense. T. 736. Error is claimed on the basis of this ruling. However, because I find Doyle and Hale dispositive, the issue is not reached below.

[9] A wrench such as Brown described was found among Petitioner's tools after the alleged crime. However, no tests were ever performed on it to determine whether it might have been used to strike Mrs. Alderman. There was also no explanation for why she was not rendered unconscious or at least much more severely injured when Brown struck her on the head with this presumably quite heavy implement.

The majority states that the district court erred in applying the Chapman test[1] conjunctively rather than disjunctively. The majority opines that the trial judge believed that he had to find the defendant's exculpatory story not totally implausible and the indicia of guilt not overwhelming, to deny habeas under Chapman. The majority says that a finding of either is sufficient to deny the writ of habeas corpus. The majority then opines that the indicia of guilt were overwhelming and thus, since one part of the disjunctive test was met, the habeas corpus writ should be denied.

There was no error in applying both prongs of the Chapman test. Chapman requires reversal if either test is met. The majority says that a finding of guilt must be affirmed if either test is met and that here the indicia of guilt are overwhelming. The majority turns the test on its head. Reversal is required if either test is met. Here the district court found that both tests were met; thus he had two reasons for reversing.

Lastly, the majority refers to United States v. Shavers, 615 F.2d 266 (5th Cir. 1980). There we said the following:

Our standard for determining whether prosecutorial comment on defendant's silence for substantive or impeachment value is harmless has been somewhat uncertain. In Chapman v. United States, 547 F.2d 1240, 1249–50 (5th Cir.), cert. denied, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), we attempted to harmonize our decisions concerning Doyle violations and the harmless error test by placing cases into three distinct categories.

Unfortunately, as was noted recently in United States v. Dixon, 593 F.2d 626 (5th Cir. 1979), many cases lie somewhere in between the categories discussed in Chapman. In such situations we must seek refuge in the case by case rule of United States v. Davis, 546 F.2d 583, 594–95 and n.31 (5th Cir.), cert. denied, 431 U.S. 906,

---

1. The Chapman test is "reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming." Chapman v. United States, 547 F.2d 1240 (5th Cir.) cert. denied, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). The entire paragraph appears on page six of the majority opinion. Actually, there are three tests in Chapman and this is the second one.

97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). "The decision requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Meneses-Davila*, 580 F.2d 888, 890 (5th Cir. 1978).

We have held that even a single reference on direct examination to defendant's silence carried an intolerably prejudicial impact, where the defendant's exculpatory story was not totally implausible and the government's inculpatory evidence was not overwhelming. *United States v. Impson*, 531 F.2d 274 (5th Cir. 1976), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 803 (1978).

615 F.2d at 269 (footnote omitted).

The district court found that the defendant's exculpatory story was not totally implausible and the government's inculpatory evidence was not overwhelming. I agree. I dissent.

### ON REHEARING AND REHEARING EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, HATCHETT, ANDERSON and THOMAS A. CLARK, Circuit Judges.

BY THE COURT:

A member of this Administrative Unit of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this Administrative Unit in active service having voted in favor of granting a rehearing en banc, 498 F.Supp. 1134.

IT IS ORDERED that the cause shall be reheard by this Administrative Unit of the Court en banc *with oral* argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.