**Jack E. ALDERMAN,
Petitioner-Appellee,**

v.

**Sam AUSTIN, Warden, Georgia State Prison, Respondent-Appellant.**

No. 80–7820.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Jan. 10, 1983.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant.

Bruce H. Morris, American Civil Liberties Union, Atlanta, Ga., Jack Greenberg, James Nabrit, III, John Charles Boger, Deborah Fins and Anthony G. Amsterdam, NAACP Legal Defense and Educ. Fund, Inc., New York City, for petitioner-appellee.

Joel Berger, New York City, for amicus curiae.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

JAMES C. HILL, Circuit Judge:

On rehearing en banc,[1] this court reviews a district court determination[2] that Jack E.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

1. The panel opinion, vacated upon the granting of the request for rehearing en banc, appears at 663 F.2d 558.

2. 498 F.Supp. 1134 (S.D.Ga.1980).

Alderman, a prisoner sentenced to death by the State of Georgia for the murder of his wife, should be granted habeas corpus relief under 28 U.S.C. § 2254 (1976). We affirm in part, reverse in part, and remand.

## I

The petitioner first asserts that jury exposure to a single comment made by a prosecution witness during trial testimony violated his constitutional rights under the teaching of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[3] The prosecution had called the witness, Special Agent Keadle of the Georgia Bureau of Investigation, to testify concerning an interview which Keadle held with the petitioner shortly after the petitioner had identified his deceased wife's body. The relevant testimony contained a single reference by Keadle to the fact that the petitioner, at one point in the interview, had expressed his wish to exercise the right to an attorney and the right to remain silent.[4]

The district court found that the petitioner's exculpatory story was not totally implausible and that the inculpatory evidence was not overwhelming. Applying *Chapman v. United States,* 547 F.2d 1240 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), the court found the *Doyle* violation was reversible error. 498 F.Supp. at 1142–44. After reviewing the record we find that the district court erred. Assuming that the comment did constitute a *Doyle* violation,[5] the error was harmless.

*Chapman* attempted to harmonize Fifth Circuit case law concerning *Doyle* violations and the harmless error test by establishing three categories of cases:

When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the im-

plausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.

Where the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.

When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

547 F.2d at 1249–50 (citations and footnote omitted).

Subsequent Fifth Circuit cases recognized, however, that "many cases lie somewhere in between the categories discussed in *Chapman.*" *United States v. Shavers,* 615 F.2d 266, 270 (5th Cir.1980). *See also Sullivan v. Alabama,* 666 F.2d 478, 485 (11th Cir.1982). The in-between cases involve the situation where the "exculpatory story told at trial is not 'totally implausible' yet the indicia of . . . guilt are substantial." *United States v. Dixon,* 593 F.2d 626, 629 (5th Cir.), *cert. denied,* 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979); *accord, United States v. Ylda,* 643 F.2d 348, 350 (5th Cir. 1981).

The district court believed that this case fell within the second category of cases described by *Chapman.* However, we be-

---

**3.** We reinstate the panel's conclusion that our review of this issue is not barred by *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). 663 F.2d at 561 n. 4.

**4.** *See* 663 F.2d at 560 n. 3.

**5.** There is some question whether the petitioner was under custodial interrogation at the time he made the comment to Keadle.

lieve that the evidence of Alderman's guilt was substantial.[6] The *Chapman* rules do not dispose of this case, therefore, because it is in between the categories *Chapman* described.[7]

Having reached that conclusion, we must determine the effect of the error under the case-by-case methodology required by *United States v. Davis,* 546 F.2d 583, 594–95 & n. 31 (5th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). "The decision requires an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *United States v. Meneses-Davila,* 580 F.2d 888, 890 (5th Cir.1978).

Keadle's statement was made during a narrative description of his interview with Alderman. It passed without any objection by the defense. It was not accusatory in nature and was obviously not used for any impermissible purpose such as impeachment. We recognize that in cases such as this, the record must be scrutinized with a skeptical eye for the purpose of discovering whether what would first appear to have been an innocent, narrative statement was actually a planned statement upon which the prosecutor based an argument of guilt. The record reveals no such misuse. Indeed, we have carefully reviewed this record and can find no place during the trial where this testimony 'was ever referred to again by a witness, the prosecutor, or the judge. In this context, and in light of the substantial evidence against Alderman, we find the alleged error to have been "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**6.** The evidence is reviewed at 498 F.Supp. 1142–44.

**7.** Followed strictly, the application of *Chapman's* second and third categories would lead to a finding of reversible error whenever the defendant's story is "not totally implausible" or not "transparently frivolous." As discussed in the text, though, subsequent Fifth Circuit cases have held *Chapman* inapplicable when the story is "not totally implausible" but the evidence of guilt is substantial or overwhelming. This

## II

As his second allegation of constitutional error, the petitioner asserts that the jury was defective under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The district court agreed that the jury was so defective, and the panel affirmed. The en banc court concludes that the panel's evaluation of this issue was correct and reinstates Parts III and IV of the panel opinion, 663 F.2d at 562–564.

The effect of this holding renders the sentence of death invalid, but does not invalidate petitioner's conviction. *Witherspoon,* 391 U.S. at 523 n. 21, 88 S.Ct. at 1777 n. 21.

## III

The district court's order issuing the writ, on the basis of *Witherspoon,* is affirmed. The State shall be prohibited from carrying out the sentence in this case unless the petitioner shall be afforded a new sentencing hearing within a reasonable time to be fixed by the district court. The district court's finding of harmful constitutional error on the *Doyle* ground is reversed. The case is remanded for proceedings not inconsistent with this opinion.

AFFIRMED in part; REVERSED in part; REMANDED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's disposition of petitioner's claim under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). I dissent, however, from the holding that *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), requires a new trial in the penalty phase of the case.

reading of Chapman's second and third categories looks, in effect, to the plausibility of the defendant's story in connection with the indicia of guilt, and it is more in accord with the cases upon which *Chapman* relied to formulate its categories than a strict, literal interpretation of *Chapman* would be. Thus, while *Chapman's* categories are helpful, Fifth Circuit precedent demonstrates that the second and third categories are not to be used as rigid rules.

*Witherspoon v. Illinois* authorizes a state trial judge in a capital case to excuse for cause any prospective juror who declares that he would "automatically vote against the imposition of capital punishment," *id.* at 522, n. 21, 88 S.Ct. at 1777, n. 21; a judge may also excuse one whose views regarding capital punishment "would prevent or substantially impair the performance of his duties. . . ." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). In deciding whether a venireman should be excused for cause, the trial judge focuses on the voir dire examination of the venireman concerning his views on the death penalty and the extent to which they might influence his verdict. The judge also considers the demeanor of the venireman exhibited during that examination. Sometimes the judge's decision on a challenge for cause is a close call, especially when the venireman's statements about capital punishment and his ability to follow the court's final instructions on the law seem irreconcilable. In such a case, the demeanor of the venireman may be the best indication of which response is the true one. In this case, the record convinces me that the trial judge reached his decisions by weighing the venireman's testimony and considering his demeanor; he found that the venireman's statement that he could vote for the death penalty, if warranted, was not worthy of credence.

The panel, which the en banc court now upholds, set aside this finding in each instance because the trial judge based it on evidence the panel considered inadmissible on the *Witherspoon* issue—the venireman's statement that he could not vote for the death penalty if he were required to sign a verdict to that effect as foreman of the jury. In the panel's view, "[w]hether a venireman could sign, in good conscience, a verdict that would result in a defendant's execution is immaterial to jury service under *Witherspoon.*" *Alderman v. Austin,* 663 F.2d 558, 563 (5th Cir.1981). The panel accordingly disregarded such evidence and considered only the venireman's statement that he would be willing to vote for the death penalty in a proper case. Standing alone, such a statement obviously precluded an excuse for cause.

What concerns me about the court's approach to its *Witherspoon* decision in this case is that it seriously curtails the prosecution's right to test the accuracy of a prospective juror's statement that he is willing to impose capital punishment and the trial judge's ability to decide the truth about his views on the subject. To me, it was entirely appropriate for the prosecutor to ask the venireman in this case whether his resolve to vote for the death penalty, if warranted by the law and the evidence, would be strong enough to enable him to sign the verdict. In each instance, the venireman said that he could not, a good indication, perhaps, of the accuracy of his earlier statement of willingness and something the trial judge should have been able to take into account in ruling on the prosecutor's challenge for cause. It would have been equally appropriate had the prosecutor asked the venireman whether, in a poll of the jury in open court following the return of the verdict, he could state that his verdict was that the defendant be put to death. A venireman who states, on voir dire, that he could not respond affirmatively to such a poll may well be disqualified, and I, for one, could not fault a trial judge for declaring him to be so.

The veniremen in this case were not asked whether they could state in open court, in response to a jury poll, that they had voted for the death penalty; thus, we can only guess at what their answers would have been. Nevertheless, the trial judge had sufficient impeaching evidence before him to disregard the veniremen's statements indicating their willingness to vote for capital punishment and to grant the prosecutor's challenges for cause. For this reason, I would deny the writ.

THOMAS A. CLARK, Circuit Judge, concurring in part and dissenting in part:

As a member of the original panel, I dissented from that part of the majority opinion treating the *Doyle* issue because I believed the district court was correct in

holding that the error was not harmless beyond a reasonable doubt. I continue in that belief and readopt my dissent which accompanied the panel opinion at 663 F.2d 564.

FAY, Circuit Judge, joined by RONEY, Circuit Judge, dissenting:

"Will you put it in writing?" Written assurances are as fundamental to our society as the Declaration of Independence. Across all walks of life a willingness to state something in writing lends added meaning. Lawyers know the importance placed upon writings and indeed the necessity for such in certain affairs. Businessmen are equally aware of the significance and necessity of writings. Indeed, even schoolchildren use written "IOU's" to record the high finances of the lunch line. The confidence our society has in those willing to commit themselves in writing should guide this court's review of the *Witherspoon* issue in this case: whether the state trial court's excusal of three veniremen for cause upon suggestions of impartiality was "fairly supported by the evidence." 28 U.S.C. § 2254(d)(8). Believing that it was, I dissent with respect to Part II of the majority opinion.

The majority opinion endorses our panel's determination that the district court properly granted federal relief to petitioner and vacated his death sentence, since three prospective jurors were improperly excluded for cause in violation of the constitutional rule announced in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Supreme Court held that a state may not constitutionally execute a death sentence imposed by a jury culled of all those who expressed general objections to the death penalty or conscientious scruples against its infliction. The Court did recognize, however, the state's power to exclude prospective jurors on grounds more narrowly drawn:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakenly clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522–523, n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in original). "This statement seems clearly designed to accommodate the state's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." *Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).[1] The state's right to have jurors who could follow the court's

---

1. Coexisting with the state's right to have a jury that is willing to consider all the penalties prescribed by law is the defendant's right to an impartial jury. The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." U.S. Const. amend. VI. The guarantee of a jury trial in nonpetty criminal cases was first made applicable to the states through the due process clause of the fourteenth amendment in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). As the Supreme Court noted in dicta in *Witherspoon,* the question is one of accommodation—"whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence." 391 U.S. at 520, n. 18, 88 S.Ct. at 1776, n. 18. A plethora of Supreme Court and Fifth Circuit cases have found that the exclusion of veniremen whose views about capital punishment would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths sufficiently accommodates the strong competing interests of the state and the defendant. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581; *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982); *Smith v. Balkcom,* 660 F.2d 573 (5th Cir.1981); *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *Burns v. Estelle,* 626 F.2d 396 (5th Cir.1980).

instructions and consider all the penalties prescribed by law "entitles [it] to exclude anyone who, for whatever reason, cannot be impartial in deliberating upon the [death penalty issue]." *Burns v. Estelle,* 626 F.2d 396, 398 (5th Cir.1980). A careful review of the voir dire examination of the three veniremen in question clearly shows that the mandates set forth by the Supreme Court in the *Witherspoon* and *Adams* decisions were strictly adhered to and followed by the state trial court. The colloquy involving one of the prospective jurors is demonstrative:

Q. [A] little while ago . . . you stated that you were not conscientiously opposed to capital punishment. Now, under Georgia law, if you believe from the evidence and the Charge of the Court that the death penalty was called for under the facts of this case, could you vote yes to inflict the death penalty?

A. Yes.

Q. You feel that you could?

A. Yes.

Q. All right, now, going a step further with this . . ., if you were selected to serve as foreman on this jury and the other eleven jurors believed that the evidence and the law required that the death penalty was proper and should be voted for in this case, could you, as foreman of the jury, following instructions given you by Judge Cheatham, write out the verdict on the indictment and sign your name to it as foreman?

A. I don't know. I don't think I could do that.

Q. I beg your pardon?

A. No, I don't believe I could do that.

Q. You don't believe you could do that?

A. No.

Q. Even though the judge instructed that if you believed from the evidence that the death penalty was warranted and you were the foreman of the jury, you could not write it out?

A. No.

MR. DREW: If your Honor please—

THE COURT: Why not?

A. I don't know. I just wouldn't want to convict anybody. I'd feel guilty.

THE COURT: Well, you would have already convicted him and as foreman, it's your responsibility—let us assume that you had convicted him—as foreman, it would be your responsibility to write that out; you say you couldn't do that?

A. No.

THE COURT: She has already said that she could vote to convict him . . . . and could vote to give him the death penalty, but could not write it out. What's the difference in your mind? . . . .

A. I don't know. This would be on my conscience. I just couldn't write it out.

(R., Vol. III, at 936–38). Two other veniremen responded in similar fashion. Following each venireman's expressions of inability or unwillingness to follow the law if required to sign or write out the death sentence, the prosecutor moved successfully to strike that individual from the venire for cause.

Our panel concluded that the voir dire examination of these veniremen did not properly limit its scope to an inquiry about opposition to the death penalty; instead, it focused on the extraneous issue of whether they could assume the further responsibility of foreman in a capital punishment case. The panel opinion reads, "[w]hether a venireman could sign, in good conscience, a verdict that would result in a defendant's execution is immaterial to jury service under *Witherspoon*." 663 F.2d 558, 563. This approach misinterprets the purpose of the state's line of inquiry. The state by inquiring into the ability of each venireman to sign the death sentence was not attempting to exclude from the venire those individuals incapable of undertaking the duty of foreman if called upon to do so. Rather, this inquiry was but a part of a series of questions designed to evoke latent biases, and calculated to ensure that each juror possessed the requisite degree of impartiality that would enable him to obey his oath and consider all the penalties prescribed by law. Thus, the state's examination of the exclud-

ed veniremen directly addressed the concerns for jury impartiality as expressed by the Supreme Court in *Witherspoon* and *Adams*. The panel, and now the majority of the *en banc* court, create interesting classes of jurors. We now have groups that are qualified to serve as jurors but unqualified to serve as foreperson. I can only read the veniremen's responses to mean—if elected to serve as foreperson I will automatically vote against any verdict that will result in the death penalty. But this is easily solved, for as the panel notes, no one is required to serve as foreperson. Since we now have a rule of law that such individuals may not be excused, I ask who will serve as foreperson when twelve such folks are seated in the jury box?

The majority opinion intimates, however, that the veniremen's early statement that they could vote for the death penalty evinced a qualifying state of mind under *Witherspoon* and further probing for disqualifying tendencies was needless. 633 F.2d at 563. I disagree. That the voir dire process is vital to the fairness of jury trials is beyond cavil. *United States v. Peterson,* 483 F.2d 1222, 1226 (D.C.Cir.1973). The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories and challenges for cause. The function of the challenges is to eliminate extremes of partiality on both sides, and assure the parties that the jury as finally selected will decide the case solely on the basis of the evidence placed before them. *Swain v. Alabama,* 380 U.S. 202, 218–220, 85 S.Ct. 824, 834–35, 13 L.Ed.2d 759 (1965). "To the extent that the examinatorial process is deficient, the impartiality of the jury could be compromised." *Peterson* at 1227.

"To achieve its wholesome goals, voir dire examination must be given a wise and liberal scope. Reasonable latitude must be indulged to inquire into attitudes and inclinations in order to assure the objectivity of the jurors ultimately chosen." *Id.* In death penalty cases and similar cases involving matters about which either the local community or the population at large is commonly known to harbor strong feelings that may significantly skew the deliberation of issues, experience and research clearly indicate that voir dire should be extensive and probing permitting counsel opportunity to ferret out possible biases and prejudices of which the jurors themselves may be unaware until certain facts are revealed. *United States v. Ledee,* 549 F.2d 990 (5th Cir.1977), *citing* American Bar Association Standards, Trial Courts, § 2.12 (1976).

During voir dire, the veniremen in question explicitly asserted their inability or unwillingness to consider the death penalty if required to sign or write out such a verdict. These firm clear statements suggested actual bias or drastic modifications in their earlier responses to direct queries about their ability to vote for the death penalty. Realizing that an individual's life was at stake and concerned with suggestions of partiality, the trial judge deliberated with counsel on the ability of the three veniremen to serve as jurors under the guidelines established in *Witherspoon* and *Adams.* After evaluating the contradictory responses of the veniremen, as well as observing their demeanor during voir dire, the state trial judge made a specific finding of actual bias. He concluded that these veniremen would be unable to follow his instructions and obey their oaths.

Our review of the state court's conclusions should be guided by the following well-established rule of law previously recognized by this circuit: "The decision to excuse a juror for cause upon a suggestion of partiality is within the sound discretion of the trial judge. To constitute grounds for reversal, an abuse of discretion must be clear." *United States v. Taylor,* 554 F.2d 200 (5th Cir.1977); *United States v. Robbins,* 500 F.2d 650 (5th Cir.1974); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Spies v. Illinois,* 123 U.S. 131, 8 S.Ct. 21, 31 L.Ed. 80 (1887); *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878); *United States v. Brown,* 540 F.2d 364 (8th Cir.1976); *United States v. Palumbo,* 401 F.2d 270 (2nd Cir.1968); *Beck v. United States,* 298 F.2d 622 (9th Cir.1962);

*United States v. Sferas,* 210 F.2d 69 (7th Cir.1954); *Bratcher v. United States,* 149 F.2d 742 (4th Cir.1945).

The rule was established in *Reynolds* that '[t]he finding of the trial court upon that issue [the force of a prospective juror's opinion] ought not be set aside by a reviewing court, unless the error is manifest.' 98 U.S. at 156 [25 L.Ed. 244]. In later cases [the United States Supreme] Court revisited *Reynolds,* citing it in each instance for the proposition that findings of impartiality should be set aside only where prejudice is 'manifest.'

*Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1642. As later explained by the Supreme Court in *United States v. Wood,* 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), "[i]mpartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any artificial formula." "The trial judge, in determining whether a juror is likely to be biased, has the benefit of observing the juror during voir dire as well as evaluating the juror's answers. For this reason, the Supreme Court has recognized that 'the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor.'" *Government of the Virgin Islands v. Gerea,* 502 F.2d 914, 934 (3rd Cir.1974), *quoting Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950).

"It is clear from the decisions that broad discretion and duty reside in the [trial] court to determine from the evidence and demeanor of the jurors on voir dire and from any other evidence available to it that the jury as finally selected is subject to no solid basis of objection on the ground of impartiality." *Government of the Virgin Islands v. Williams,* 476 F.2d 771, 775 (3rd Cir.1977), *citing Frazier v. United States,* 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948). It is equally clear that the defendant undertakes a heavy burden in attempting to persuade a reviewing court that there was error in a trial court's decision to excuse a juror for cause upon a suggestion of partiality. As emphasized by the Second Circuit in *United States v. Ploof,* 464 F.2d 116, 118, n. 4 (2nd Cir.1972),

There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury.

There has been no showing of a clear abuse of discretion committed by the state court in excusing the three veniremen for cause. State trial judges are entitled to no less deference than federal trial judges. The trial judge was in the best position to evaluate the veniremen's demeanor during voir dire and to determine, by their answers to the state's questions, whether they could fairly and impartially hear the case and return a verdict based solely on the evidence presented in court. The state trial judge properly made that determination. Recognizing the trial judge's broad discretion to rule upon suggestions of partiality, his determination should not be set aside.

Our panel determined that the federal district court properly granted the habeas petition. The majority of the en banc court adopts the panel's determination. I find the majority's position unpersuasive as well as perplexing given "the limited nature of review provided federal courts by 28 U.S.C. § 2245." *Sumner v. Mata,* 449 U.S. 539, 541, 101 S.Ct. 764, 766, 66 L.Ed.2d 722 (1981). As emphasized by the Supreme Court in its seminal decision in *Townsend v. Sain,* 372 U.S. 293, 311–12, 83 S.Ct. 745, 756, 9 L.Ed.2d 770, 785 (1963),

[t]he whole history of the writ—its unique development—refutes a construction of the federal courts' habeas corpus powers that would assimilate their tasks to that of courts of appellate review. The function on habeas is different. It is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations.

"While the great writ has tremendous corrective power it has never been viewed as limitless. Even in *Townsend,* the [United States Supreme] Court recognized state-federal comity and the conservation of judicial resources as relevant to the exercise of habeas jurisdiction." *Trahan v. Estelle,* 544 F.2d 1305, 1333 (5th Cir.1977). Consequently, in a federal habeas corpus proceeding instituted by a state prisoner, the federal court is bound by the provisions set forth in 28 U.S.C. § 2254(d), which provide that, in the absence of any of the circumstances specifically enunciated therein, the findings of the state court are presumed to be correct and the petitioner has the burden of establishing "by convincing evidence that the factual determination of the state court was erroneous." *LaVallee v. Delle Rose,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973); *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Williams v. Blackburn,* 649 F.2d 1019 (5th Cir.1981).

Given the applicability of § 2254(d) to this case, it is apparent that the federal district court (as well as our panel) did not apply the "presumption of correctness" which is mandated by the statute to the *factual* determinations made by the state trial court. Indeed, the federal district court in its opinion did not even refer to § 2254(d). In *Sumner v. Mata,* the Supreme Court cautioned the federal judiciary to observe strictly the requirements of 28 U.S.C. § 2254(d), and to disturb the findings of a state court only under the circumstances provided in § 2254(d)(1)–(8). The Court held that if a reviewing court believes that one of those enunciated circumstances is present, then the court must state explicitly its rationale for concluding that such a circumstance is present and cite the statutory provision upon which it relies. The Supreme Court stressed that such a statement was necessary to minimize "friction" between state and federal courts by ensuring that state court factual determina-

tions are overturned only when those findings were clearly deficient. "Moreover, such a statement would have the obvious value of enabling courts of appeals and the [Supreme] Court to satisfy themselves that the congressional mandate [embodied in § 2254(d) ] has been complied with. No court reviewing the grant of an application for habeas corpus should be left to guess as to the habeas court's reasons for granting relief notwithstanding the provisions of § 2254(d)." 449 U.S. at 551–552, 101 S.Ct. at 771.

Here, the federal district court's opinion did not make explicit reference to any of the exceptions listed in § 2254(d). "Reading [its] opinion in conjunction with [said section], it is clear that the [district] court could not have even implicitly relied on paragraphs 1 through 7 of § 2254(d) in reaching its decision. It is impossible to tell whether the court relied on subsection (8) because its opinion gives no indication that § 2254 was even considered." *Id.,* at 552, 101 S.Ct. at 770.[2] I surmise, considering the tenor of the federal district court opinion, that the state court's factual determinations were rejected as not being "fairly supported by the record." Section 2254(d)(8).

"The statutory standard of 'fairly supported by the evidence' has been held to be the same as the 'clearly erroneous' standard employed in federal appellate review of trial findings on constitutional facts." *Wright v. State of North Carolina,* 483 F.2d 405, 408 (4th Cir.1973), *citing Leavitt v. Howard,* 462 F.2d 992, 966 (1st Cir.1972), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). *Moore v. Ballone,* 658 F.2d 218 (4th Cir.1981); *See, Sumner v. Mata,* 449 U.S. at 549, 101 S.Ct. at 770; Developments in the Law—Federal Habeas Corpus, 83 Harv.L. Rev. 1038, 1133–34 (1970). The Supreme Court has defined a finding as "clearly erroneous" when, "although there is evidence to

2. The presumption of correctness accorded state court findings of facts can be raised upon a showing of procedural defects in the state court proceedings. No one has questioned the fullness or fairness of the state court proceed-

ings. Consequently, there is no question as to the presence of one of the exceptions to the presumption of correctness listed in § 2254(d)(1–7).

support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). *United States v. Oregon State Medical Society*, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952). This characterization of the "clearly erroneous test" has been reaffirmed by the Supreme Court in its recent decision in *Pullman Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). There, the Court emphasized the deference Fed.R. Civ.P. 52 requires of reviewing courts to give to trial courts findings of facts: "Rule 52 broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or · purport to exclude certain categories of factual findings from the obligation of a Court of Appeals to accept a [trial] court's findings unless clearly erroneous." *Id.*, at 287, 102 S.Ct. at 1789; *Rogers v. Lodge*, —— U.S. ——, —— - ——, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982). As aptly noted by Justice Marshall in his dissent in *Swint*,

> [t]he major premise behind the deference to trial courts expressed in Rule 52 is that findings of fact 'depend peculiarly upon the credit given to witnesses by those who see and hear them.' *United States v. Yellow Cab Co.*, 338 U.S. 338, 341 [70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); see also *United States v. Oregon State Medical Society*, 343 U.S. 326, 332 [72 S.Ct. 690, 695, 96 L.Ed. 978] (1952). Indeed Rule 52(a) expressly acknowledges the importance of this factor by stating that 'due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' Consequently, this Court has been especially reluctant to resolve factual issues which depend on the credibility of witnesses. See generally *United States v. Oregon Medical Society*, supra, 343 U.S. at 332 [72 S.Ct. at 695].

*Id.*, at 301, 102 S.Ct. at 1796 (Dissenting Opinion, Justice Marshall, joined by Justice Blackmun).

In the present case, the state trial court made specific factual findings of partiality. Its findings of facts also included a resolution of conflicts in the voir dire responses of the veniremen in question. In the face of inconsistent and contradictory expressions concerning their ability to fairly consider the death penalty, the state trial court specifically found that their assertions of impartiality were unworthy of belief. He further concluded that these veniremen were of such mental conviction that they were incapable of following the court's instructions and obeying their oaths. The federal district court, our panel, and now a majority of the en banc court, after reviewing a cold record, disagree with the state court's findings of partiality and credibility choices. These questions, as I see it, are pure questions of fact, subject to Rule 52's clearly erroneous standard. Consequently, the trial court's customary opportunity to evaluate the deportment and thus the credibility of the prospective jurors, which is the rationale behind Rule 52(a), precludes any reviewing court from disregarding its credibility determinations and findings of partiality when fairly supported by the record. Appellate courts possess "no empirical expertise to set against the careful and reasonable conclusions of lower courts on purely factual issues. When, as here, resolution of the disputed factual issues turns largely on an assessment of the relative credibility of witnesses [or veniremen] whose testimonial demeanor was observed only by the trial court the rule has particular force." *Berenyl v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 636, 87 S.Ct. 666, 670, 17 L.Ed.2d 656 (1967). These observations of the Supreme Court in *United States v. Oregon State Medical Society* seem particularly appropriate:

> Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth ... How can we say the judge is wrong? We never saw the witnesses.... To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.

**134**

343 U.S. at 326, 72 S.Ct. at 690, *quoting Boyd v. Boyd,* 252 N.Y. 422, 429, 169 N.E. 632, 634.

The record does not leave me with any conviction, much less a firm one, that the state trial judge was mistaken, on the basis of his own observations during the voir dire process and his own resolution of the complex and contradictory responses given by the prospective jurors, in believing that the excluded venireman could not be trusted to apply the law to all the issues in the case and abide by their oaths. Moreover, Section 2254(d) was enacted to lessen the strains in our federalistic system imposed by the habeas corpus power of the federal courts. As such, its dictates must not be taken lightly; once a state court of competent jurisdiction has made a finding of fact after a proper adversarial proceeding, it is not the role of the federal courts to intrude, unless an explicit finding of one of the eight prerequisites for intervention recited in § 2254(d) is made. We are not free to interfere with state court proceedings merely because we might have followed a different course had we been presiding as the trial judge. I greatly fear that is exactly what is happening in this case and consequently dissent from Part II of the majority opinion.